439 A.2d 805

**COMMONWEALTH of Pennsylvania**

v.

**Brett TAYLOR, Appellant.**

**COMMONWEALTH of Pennsylvania**

v.

**Carl V. KING, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 12, 1980.

Filed Jan. 8, 1982.

Petition for Allowance of Appeal Denied April 7, 1982.

John H. Corbett, Jr., and David G. Metinko, Pittsburgh, for appellants.

Dara A. DeCourey, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before HESTER, BROSKY and VAN der VOORT, JJ.

HESTER, Judge:

The appellants, Carl King and Brett Taylor, were both convicted following a jury trial in the Court of Common Pleas of Allegheny County, of rape, involuntary deviate sexual intercourse, criminal attempt, aggravated assault, burglary, recklessly endangering another person, and criminal conspiracy.

The relevant facts concern a gruesome account of what happened to Karen Gallagher on the evening on January 13, 1979. For the purposes of this Opinion, a brief summary of this event will suffice. Miss Gallagher met two black males, for the first time, at a party given by her next door neighbor

at 61 Lawn Street in the City of Pittsburgh on the evening of January 13, 1979. She carried on a conversation with both of these men in a well-lighted room for approximately 10 to 15 minutes. Following this conversation, Miss Gallagher returned to her apartment at 63 Lawn Street, accompanied by the same two men, in order to search for some marijuana, which she intended to contribute to the party. Due to the fact that she could not find anything, she decided not to return to the party and requested that the two men leave. After the two men left, Miss Gallagher retired to bed. Sometime later that night, she was awakened by a loud noise. When she went into her living room to investigate, she found the same two men standing in the living room. The lights were on in the living room at the time. Following her repeated demands that the two men leave, the two men suddenly grabbed her, and started beating her head against a door jam and articles of furniture. The two men committed multiple acts of rape and deviate sexual intercourse upon her while continuing to beat her severely. The two men finally threw a table top on her and slit her throat with a knife.

Appellants do not contest the sufficiency of the evidence presented, nor do they question that these grotesquely brutal acts were committed upon the victim.

Both appellants raise four issues on appeal, all of which involve the competency of Karen Gallagher to testify at trial, due to the fact that she was hypnotized by a police hypnotic investigative expert on February 8, 1979. Appellants contend that, due to the fact that the victim was hypnotized, her testimony was unreliable because of the potential for fantasy and confabulation which the hypnosis produced.

We disagree and, therefore, affirm the judgment of sentence with respect to both appellants.

The Supreme Court of Pennsylvania has recently decided the appeal of the three co-defendants allegedly involved in the Heidi Morningstar murder. *Commonwealth v. Nazarovitch et al.*, 496 Pa. 97, 436 A.2d 170 (1981). Speaking for a unanimous Court, Chief Justice O'Brien held that the Com-

monwealth's chief witness was incompetent to testify against the defendants because her memory had been refreshed by the use of hypnosis.

The Supreme Court stated:

"While we do not want to establish a *pro se* rule of inadmissibility at this time, we will not permit the introduction of hypnotically-refreshed testimony until we are presented with more conclusive proof than has been offered to date of the reliability of hypnotically-retrieved memory. We believe that the facts of this case warranted the suppression by the trial judge of this witness' refreshed testimony." (496 Pa. 111, 436 A.2d at 178).

In *Nazarovitch*, supra, the Supreme Court closely scrutinized the scientific basis and use of hypnosis and also summarized the authority of the federal courts and sister states concerning this subject. We will not attempt to reanalyze this authority, due to the fact that the record before us contains no expert testimony or other scientific information which has not already been considered by the Supreme Court and also due to the fact that we are not impressed with the safeguards and procedures utilized by the investigating officer during the hypnotic session with the victim.[1]

Although we do abide by the learned decision of the Supreme Court, the instant appeal is clearly distinguishable from *Nazarovitch*, supra. The issue in *Nazarovitch*, as succinctly stated by the Court, was: "This case raises the novel issue of whether hypnotically-refreshed testimony is admissible in a criminal trial when the witness has no present recollection of the facts prior to hypnosis." (496 Pa. 99, 436 A.2d at page 171).

1. Our reading of the Supreme Court's decision in *Nazarovitch*, supra, reveals that the Supreme Court did not approve any procedural safeguards which would insure the reliability and neutrality of memory refreshed by hypnosis. See *State v. Hurd*, 86 N.J. 525, 432 A.2d 86, 95 (1981). The Supreme Court has, in effect, adopted a *pro se* rule of inadmissibility concerning hypnotically-refreshed testimony until the court is presented with more scientifically-conclusive evidence that such testimony is reliable, to the same extent as testimony which is refreshed by reviewing a written document.

In the instant case, it is apparent that Karen Gallagher did have present recollection of the identity of her assailants, prior to the hypnotic session on February 8, 1979.[2]

■ The issue before us on appeal is not whether the evidence supports the various elements of the crimes of which the appellants were convicted. The crucial inquiry is whether the two appellants, were in fact, the two assailants who committed the crimes which were proven, a question of identification. In order to determine this issue, it is necessary to determine whether the victim's identification of the two appellants at trial was rendered inadmissible as a result of the ill-advised hypnotic session. Under the circumstances of this case, we hold that the victim's testimony was admissible due to the fact that she identified both appellants prior to the hypnotic session.

The victim was found in critical condition by her roommate Frank Poloney early in the morning on January 14, 1979. Since their telephone had been ripped out of the wall, Poloney told the victim he was going next door to 61 Lawn Street in order to call the police. In her condition, the victim still managed to protest by uttering, "They did it"! While she was being treated by paramedics at her apartment, the victim continually pointed toward 61 Lawn Street. Although she was near death, the victim managed to indicate the association between 61 Lawn Street and the crime.

The victim was taken to Presbyterian University Hospital, where police attempted to interview her concerning the

2. It is difficult to imagine why the investigating officers would risk the Commonwealth's chances of conviction by conducting the hypnotic session at issue. At the suppression hearing, the trial court patiently listened to the testimony relating to the session. Apparently, due to the fact that Karen Gallagher had been so severely beaten by her assailants, she lapsed in and out of consciousness during the later stages of her assault, following the multiple acts of rape and involuntary deviate sexual intercourse. Accordingly, the investigating officer who conducted the hypnotic session testified that the victim was hypnotized in order to determine which assailant had cut her throat and other facts which occurred during the later stages of the assault. These facts would be legally unnecessary to sustain the conviction of both assailants on all counts, since both defendants conspired to commit the violent criminal acts in question and did in fact commit the acts in concert.

identity of her assailants. Due to the severe nature of her throat wound, she was unable to speak. In response to police questions about the identity of her assailants, she wrote on a card, "Carl and friend, Carl, Carl". Clearly, this response indicates there were two persons involved, one named Carl and the other person being Carl's friend. In the context of the victim's other testimony concerning how she was introduced to Carl and his friend at a party given by her next door neighbor earlier in the evening of January 13, 1979 and how Carl and his friend had accompanied her for a brief period to her apartment, this response establishes that the victim had prior recollection to the effect that her two assailants were, in fact, the two black men who she had met earlier at the party.

This positive identification is also consistent with the testimony of the numerous other persons who attended the party on January 13, 1979, for the purpose of verifying that both appellants had, in fact, attended the party and had been introduced to the victim. The victim had numerous opportunities to clearly see both appellants at the party, when they returned to her apartment and when they subsequently broke into her apartment in the lighted living room.

The entire scenario was also reinforced by a Mr. John Gant, who was a friend of both appellants and who lived below appellant King in the same apartment house. Mr. Gant testified that, although he did not attend the party on January 13, 1979, both appellants had called him from the party on two occasions during the evening and repeatedly asked him to come to the party. After the party, early in the morning of January 14, 1979, both appellants woke up Mr. Gant and spent approximately one-half hour talking to him in his apartment, thereby verifying that the appellants had been together during the entire period in question.

While she was in the emergency room at the hospital, the victim also answered the question, whether she had been raped by nodding her head affirmatively.

More importantly, on January 16, 1979, while the victim was still in the intensive care unit in the Presbyterian

Hospital, she choose appellant King's picture from a series of photographs brought to her by the police. On January 19, 1979, she selected a photograph of appellant Taylor from a series of photographs. Therefore, prior to the hypnotic session of February 8, 1979, the victim had positively identified both appellants.

On February 20, 1979, the victim identified appellant King at a police line-up, as one of her assailants.

On February 14, 1979, the victim attended a line-up at which time she misidentified another person as being appellant Taylor.[3] However, the appellant subsequently identified Mr. Taylor at a second line-up. The fact that the victim had mistakenly identified the wrong person at the line-up was, of course, brought before the jury's attention. The victim stated at trial that she was extremely nervous and "paranoid" at the prospect of facing appellant Taylor and identified another man although she was unsure at the time. There was also testimony to the effect that appellant Taylor normally had his hair matted down but, just prior to the line-up, someone handed him a comb which he used to fluff his hair. He also took off his glasses. After the line-up, appellant Taylor matted down his hair again, as it was before. When it was decided by the police to take a photograph of the line-up, appellant Taylor once again fluffed his hair. Under these circumstances, the lower court properly allowed the jury to consider the weight of the evidence in determining whether the victim had made a positive identification of appellant Taylor.

It is clear that the victim was able to positively identify both of her assailants prior to the hypnotic session. Therefore, with respect to the victim's ability to identify her two assailants, the hypnotic session did not, in fact, refresh her memory and the dangers of unreliable suggestion, fantasy and confabulation are not at issue. With respect to what happened to the victim after she was raped, during the period in which she lapsed in and out of consciousness, our review of the entire trial transcript, suppression hearing

3. Interestingly enough, the misidentification occurred after the hypnotic session at issue.

transcript and transcript of the hypnotic session itself confirms that the prosecution deliberately did not attempt to utilize any testimony of the victim which conceivably surfaced for the first time as a result of the hypnotic session on February 8, 1979. Therefore, the victim's testimony was not rendered incompetent by the hypnotic session due to the fact that she did have prior recollection. See *Creamer v. State*, 232 Ga. 136, 205 S.E.2d 240 (1974); *Merrifield v. State*, 400 N.E.2d 146 (Ind., 1980); *State v. McQueen*, 295 N.C. 96, 244 S.E.2d 414 (1978). *State v. Mena*, 128 Ariz. 244, 624 P.2d 1292 (1980); reversed in part, 128 Ariz. 226, 624 P.2d 1274 (1981).

The appellants also question on appeal the fact that the jury was never informed of the fact that the victim had undergone hypnosis on February 8, 1979. Counsel for both appellants did attempt to utilize the statements which the victim had made on February 8, 1979 as prior inconsistent statement for the purposes of impeaching the victim's credibility. However, the fact that the victim had actually been hypnotized was never brought to the jury's attention. During the suppression hearing, the lower court did rule, following lengthy testimony concerning the details of the hypnotic session, that any further testimony concerning the hypnotic session was irrelevant, due to the fact that the victim had positively identified both appellants prior to the session. The lower court did thoroughly review the extent of the details which were obtained at the hypnotic session and correctly determined that the victim had prior recollection of the identity of her assailants and of the principal facts constituting the elements of the crimes for which the appellants were convicted.

The record is also clear that, immediately prior to the beginning of the jury trial, the lower court ruled that the victim was competent to testify and that defense counsel could cross-examine the victim concerning the hypnotic session in order to attempt to impeach her credibility.

The fact that defense counsel did not mention the fact that the victim had been hypnotized is explained in the briefs of the respective appellants, as follow:

"The prosecution could reasonably assume after the suppression hearing that a full exploration of the potential abuses of hypnosis would not be forthcoming, and if the defense elected to force the issue even graver consequences would result with the admission of unreliable and prejudicial evidence."

Therefore, it would appear that counsel for both appellants made the tactical decision at trial not to mention anything concerning the hypnotic session, so as to avoid the potential prejudice resulting from the admission of the entire transcript of the hypnotic session.

Under the circumstances of this case, we do not see that it was the affirmative duty of the prosecution to mention the use of hypnosis to the jury, since the prosecution had already made the tactical decision to intentionally avoid utilizing any testimony or evidence which was initially evoked as a result of the hypnotic session.

The appellants were convicted on the strength of the unrefreshed testimony of the victim, as corroborated by the testimony of the various other persons who had attended the party on January 13, 1979.

Judgment of sentence affirmed.