449 A.2d 670

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Paul Richard McCABE.**

Superior Court of Pennsylvania.

Argued Sept. 23, 1981.

Filed Aug. 13, 1982.

**6.** Act of 1978, April 28, P.L. 202, No. 53, 22.

**7.** Act of 1978, April 28, P.L. 202, No. 53, 30.

246

Gary E. Hartman, District Attorney, Gettysburg, for Commonwealth, appellant.

Samuel K. Gates, York, for appellee.

Before BROSKY, McEWEN and BECK, JJ.

BECK, Judge:

The Commonwealth appeals an order of the Court of Common Pleas of Adams County which granted appellee's motion to suppress the testimony of a Commonwealth witness. The sole issue on appeal is whether the trial court properly suppressed the witness' testimony as to matters which came to the witness' consciousness through hypnosis. We affirm.

## JURISDICTION

Appellee asserts that this Court lacks jurisdiction[1] over the instant case because the Commonwealth is attempting to appeal an interlocutory order, *i.e.*, the order granting appellee's motion to suppress.

On December 31, 1980, the Commonwealth filed a notice of appeal pursuant to Pa.R.A.P. 902 which governs appeals "as of right from a lower court to an appellate court." *Id.* On January 6, 1981, under Pa.R.A.P. 1311, the Commonwealth also filed a petition for permission to appeal from an interlocutory order. Both the Commonwealth's notice of appeal and its petition for permission to appeal concerned the trial court's granting of appellee's suppression motion. Finally, on June 8, 1981, appellee filed a motion to quash the Commonwealth's appeal of the suppression order, arguing that the order was interlocutory and thus nonappealable.

Pursuant to Section 702(a)–(b) of the Judicial Code, 42 Pa.C.S. § 702(a)–(b), interlocutory orders are appealable only (a) as of right if enumerated in Pa.R.A.P. 311 or (b) by permission of the court in accordance with Pa.R.A.P. 312. However, Section 702(b) of the Judicial Code and Pa.R.A.P. 1311(b) provide that permission to appeal an interlocutory order may be sought only where the order states that "a controlling question of law [is involved] as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter . . . ." 42 Pa.C.S. § 702(b). Because in the present case the lower court's order did not include the required statement and because the Commonwealth filed a notice of appeal, this Court on June 16, 1981, denied the Commonwealth's petition for permission to appeal. *Butler Education Association v. Butler Area*

---

1. In its brief the Commonwealth incorrectly states that the Superior Court has jurisdiction of this case under Section 722 of the Judicial Code, 42 Pa.C.S. § 722, a provision which addresses the exclusive jurisdiction of the Supreme Court. In fact this Court has jurisdiction of this case pursuant to Section 742 of the Judicial Code, 42 Pa.C.S. § 742, which provides that the "Superior Court shall have exclusive appellate jurisdiction of all appeals from final orders of the court of common pleas . . . ." *Id.*

*School District,* 34 Pa.Commw.Ct. 143, 382 A.2d 1283 (1978). Additionally, on July 21, 1981, this Court denied appellee's motion to quash, and the Commonwealth proceeded on its notice of appeal. "[I]t is settled that the Commonwealth may appeal from a pretrial suppression order if the question raised is a pure question of law and if the order effectively terminates or substantially handicaps the prosecution." *Commonwealth v. Pfender,* 280 Pa.Super.Ct. 417, 421, 421 A.2d 791, 793 (1980).

> From the point of view of the Commonwealth, two possible situations may arise: (a) the order of suppression will result in a termination and conclusion of the prosecution or (b) while the order of suppression will not result in a termination or conclusion of the prosecution, it will result in a prosecution wherein the Commonwealth is substantially handicapped because it cannot present *all* its available evidence. In the first situation, the element of finality inherent in the order of suppression is apparent and sufficient to render the order appealable. In the second situation, although the element of finality in the order is not so apparent, it is nevertheless present .... In *both* factual situations the practical effects of an order granting the suppression of evidence give to the order such an attribute of finality as to justify the grant of the right of appeal to the Commonwealth in both situations.

*Commonwealth v. Bosurgi,* 411 Pa. 56, 63–64, 190 A.2d 304, 308 (1963), *cert. denied,* 375 U.S. 910, 84 S.Ct. 204, 11 L.Ed.2d 149 (1963) (emphasis in original) (quoted approvingly in *Commonwealth v. Nastari,* 232 Pa.Super.Ct. 405, 408 n.1, 335 A.2d 468, 469–70 n.1 (1975), *allocatur denied,* May 22, 1975); *Commonwealth v. Nazarovitch,* 496 Pa. 97 n.1, 436 A.2d 170, 172 n.1 (1981).

To appeal a suppression order, "the Commonwealth must include in its brief, in support of its claim that this court has jurisdiction to hear the appeal, first, a statement that the suppression will terminate or substantially handicap the prosecution; and second, a brief explanation, not inconsistent with the record, why this is so." *Commonwealth v.*

*Kunkel*, 254 Pa.Super.Ct. 5, 10, 385 A.2d 496, 499 (1978). Here, the Commonwealth comported with *Kunkel* by including the following statement in its brief:

> As the trial court noted in its opinion of January 27, 1981, the Order decided law novel to Pennsylvania and *effectively terminated the Commonwealth's ability to prosecute.* The hypnotically induced testimony which was suppressed was the only evidence which implicated Paul Richard McCabe in the deaths of Nancy and Debbie Patterson or the related charges.

(Emphasis in Commonwealth's brief.)

## FACTS SURROUNDING THE WITNESS' HYPNOTICALLY–INDUCED TESTIMONY

Being awakened by noise during the early hours of August 30, 1980, the witness, a sixteen-year-old girl, discovered that her home was afire and fled. During the next hour, the witness' mother and older sister were fatally shot in the front yard of the witness' home; Paul Sells, a member of the witness' household, was injured, and only the witness and her nine-year-old brother escaped harm.

On August 30, 1980, Paul Sells was able to identify his assailant as Keith, the witness' brother who lived in a residence with appellee. Consequently, the police arrested not only Keith but also appellee, Keith's only known associate. However, appellee was released the same day for lack of evidence, and his release was reported in several news articles read by, or made known to, the witness.

The police attempted to question the witness the day after the fatal incident but found the witness too distraught. The witness' statement was finally taken at a state police barracks on September 1, 1980. The witness reported that upon being awakened early on August 30, 1980, by the sound of a smoke alarm and breaking glass, she found her home afire. She quickly exited her home through the kitchen door and saw that a man with a shot gun was standing on the back porch of her home. The witness did not identify the man with the gun but described him as having wavy brown hair

parted on the side of his head. The witness stated that after leaving her home she ran to a shed and hid. While hidden, the witness heard gun shots and the sound of someone running whereupon she moved to the front yard of her home. At this point the witness discovered Paul Sells who was wounded and lying on the ground. Mr. Sells told the witness to seek a neighbor's assistance, and the witness complied. The witness did not supply additional details of the crime or identify a possible perpetrator.

To obtain more information from the witness, the police requested the aid of a hypnotist, Father James Delaney, an assistant professor of psychology at Mount St. Mary's College in Maryland. Through hypnosis Father Delaney had assisted law enforcement officials of various jurisdictions on eighteen previous occasions. In approximately 1966 Father Delaney had received some training in hypnosis at Duquesne University and in 1977 had taken a four-day training course in investigative hypnosis offered by the Los Angeles Police Department. Moreover, he regularly practiced hypnosis in diverse contexts and regularly read literature published by the Society for Investigative and Forensic Hypnotists, a group composed of individuals who attended the Los Angeles Police Department course.

When contacted by the police, Father Delaney knew nothing about the case and, by design, remained uninformed. Father Delaney agreed to the hypnotic interview, and on September 4, 1980, the witness was accompanied to Mount St. Mary's College by two state troopers who explained to the witness that she would be hypnotized for the purpose of gaining additional information from her about the crime.

Before hypnotizing the witness, Father Delaney attempted to ease the witness' apprehensions by demonstrating his hypnotic technique on another subject. This subject was subsequently dismissed, and only Father Delaney and the two state troopers remained with the witness. Then Father Delaney hypnotized the witness, told her to use her imagination, and stated that he would let a trooper question her. Although a trooper conducted the actual, taped interview,

Father Delaney interpolated praise whenever the witness produced identifications and also repeated or rephrased several of the witness' responses.

Under hypnosis the witness again stated that she had seen a man on the porch of her home. Pressed to name the man, the witness answered, "Keith." Later asked again to identify the man on the porch, the witness responded, "[I]t's my brother." Thereafter, the trooper questioning the witness constantly referred to the man on the porch as Keith.

Additionally, while hypnotized, the witness indicated the presence of a second perpetrator, "another man." Asked to describe the second man and his location during the incident, the witness faltered. Father Delaney then prompted the witness by saying, "[U]se your eyes now as if you were a camera .... [M]ove slowly in on the man's face .... Now could you describe the man's face ...." After the witness had identified the other man as "McCabe," the trooper and the witness had the following suggestive exchange:

> Trooper: "You saw two shots from the back door at Paul [Sells] toward the front door?"
>
> Witness: "Didn't see—heard."
>
> Trooper: "You heard?"
>
> Witness: "Me and Keith."
>
> Trooper: "You seen [sic] Keith and you seen [sic] Paul McCabe [appellee]?"
>
> Witness: "Outside."

In concluding the hypnotic session, Father Delaney said to the witness, "Now, everything that you remembered here, you will be able to remember when I take you back. You may be able to remember some more things."

Subsequently, as a result of the witness' hypnotically-induced testimony, appellee was arrested. At the preliminary hearing the witness testified that appellee participated in the crime.

Through his counsel appellee then filed a motion to suppress the witness' hypnotically-induced identification of him

as a participant in the incident. At the suppression hearing the witness was questioned about her ability to identify appellee as the second man involved in the incident. Despite testifying that the incident occurred at night, that she was not wearing her eyeglasses during the incident, and that she was hiding some distance from her home during most of the incident, the myopic witness stated that she could clearly identify appellee because her vision seemed to improve while she was hypnotized so that she could "zoom in on" distant objects impossible for her to see when not hypnotized.

The witness also testified that she had recurrent dreams of the incident. Queried about her dreams, the witness explained that before the hypnotic interview with Father Delaney, she visualized as participants in the incident various persons including appellee, Keith, and other individuals not suspected of the actual crime. However, the witness further explained that after the hypnotic session her dreams focused on Keith and appellee as the sole perpetrators of the crime.

Finally, the witness admitted not only that she had disliked appellee for at least one and one-half years prior to the incident but also that appellee's initial release from custody for lack of evidence had greatly distressed her and others with whom she had discussed the incident.

Appearing for the Commonwealth, Father Delaney detailed the circumstances surrounding the hypnotic interview and characterized the interview as a "good session" because the witness gave a "vivid" account. However, Father Delaney added, "Whether the [witness] were telling the truth under [hypnosis], I would have no way of ascertaining . . . from what I know of the relationship." On cross-examination, agreeing with various authorities cited by counsel for appellee, Father Delaney asserted that in a hypnotic session "you're just as likely to get confabulation as you are the truth." [2]

---

2. Confabulation is defined as the substitution of free fabrication for actual memory. It is a completely unconscious substitution which occurs during hypnosis with even the most honest subjects. To

As his expert witness appellee offered Dr. Michael Potash, a practicing Maryland psychiatrist and a professor of psychiatry at Johns Hopkins University, who had been trained in hypnosis, was thoroughly familiar with literature concerning hypnosis, and had acted as a consultant to the Baltimore Police Department for fifteen years. In general, Dr. Potash asserted that investigative hypnosis was useful in locating real evidence but was completely unreliable in developing the testimony of a witness. He explained that a hypnotized witness was very likely to fantasy, to incorporate into an account information heard immediately before the hypnotic session, and to invent information to respond to the perceived demands of the questioner for specific data.[3]

In particular, Dr. Potash analyzed the hypnotic interview of the instant witness and found that the following aspects of the interview would tend to elicit fantasy, rather than fact, from the witness:

  (a) At the beginning of the hypnotic session Father Delaney told the witness to use her imagination.

  (b) The hypnotic interview was actually conducted by a state trooper who, the witness knew, was seeking specific identification of the criminal perpetrator.

  (c) The myopic witness was told to use her eyes as a camera with a telescopic lens that could be used to bring distant objects into focus. But the witness

illustrate, in the present case it is possible that the witness (a) being unable to describe the individual whom she actually saw engaged in the real events heretofore related and (b) being pressed under hypnotic questioning for the identity of the individual, might fill the gap in her memory by drawing an identity from her general life experience or from her imagination. Later, the witness would remember this "fill-in" as fact.

**3.** For example, Dr. Potash explained:

No one has figured out a way to tell whether somebody who has been hypnotized and produces a bunch of information—what part of it is accurate and what part isn't. Only in the last few years have doctors taken the trouble to put people in a trance, get all this information and then go out like detectives and check all the information. Go back and check everything that the patient said under hypnosis. When they do that what they find is there is as much information inaccurate as there is accurate.

testified that when she was not hypnotized, she could not thus use her eyes.

(d) At the conclusion of the hypnotic session, Father Delaney told the witness that after she left the hypnotic state, she would remember what had transpired during the hypnotic interview.

Dr. Potash reported case histories in which witnesses given post-hypnotic suggestions to remember their hypnotic testimony could not be convinced that their post-hypnotic "memories" were inaccurate even when refuted by incontrovertible evidence. Dr. Potash further observed that during the suppression hearing, the instant witness appeared anxious to please questioners and thus would be likely under hypnosis to subconsciously produce answers which would satisfy her interviewers. Dr. Potash noted that the witness' tendency toward complaisance would have been reinforced during the hypnotic session by Father Delaney's expressions of approval whenever the witness produced an identification.

Therefore, Dr. Potash opined that the witness' hypnotically-induced testimony, although "truthful" from the witness' viewpoint, was totally unreliable because it was tainted by the aforementioned factors.

## APPLICABLE LEGAL STANDARDS

In *Nazarovitch* [1981] the Supreme Court of Pennsylvania considered, as a case of first impression, the admissibility of hypnotically-induced testimony.[4] The court's decision not to

4. Following the decision in *Nazarovitch*, this Court had the opportunity to examine hypnotically-induced testimony in *Commonwealth v. Taylor*, 294 Pa.Super.Ct. 171, 439 A.2d 805 (1982). In *Taylor* the issue was "whether the victim's identification of the two appellants at trial was rendered inadmissible as a result of [a] ... hypnotic session [prior to trial]." *Id.*, 294 Pa.Superior Ct. at 174, 439 A.2d at 807. However, in *Taylor*, unlike the case sub judice, the victim "was able to positively identify both of her assailants prior to the hypnotic session. Therefore, ... the hypnotic session did not ... refresh her memory and the dangers of unreliable suggestion, fantasy and confabulation [were] not at issue." *Id.*, 294 Pa.Superior Ct. at 177, 439 A.2d at 808. Furthermore, this Court's review of the record in *Taylor* showed "that the prosecution deliberately did not attempt to utilize any testimony ... which conceivably surfaced for the first time as a

admit such testimony under the circumstances of that case was predicated upon a careful consideration of the state of the art of hypnosis. Other jurisdictions which had already confronted the issue [5] differed in result based largely on their evaluation of the quality of contemporary research and expertise on hypnosis.

In 1968 the intermediate appellate court of Maryland determined that, given indicia of reliability surrounding a hypnotic session and the testimony thereby elicited, hypnotically-induced testimony would be wholly admissible, the weight and credibility of such testimony being for the fact-finder to ascertain. *Harding v. State*, 5 Md.App. 230, 246 A.2d 302 (1968). For more than a decade, with little discussion, many courts followed *Harding*. *See, e.g., Kline v. Ford Motor Co.*, 523 F.2d 1067 (9th Cir. 1975) (hypnotically-induced testimony analogized to testimony elicited by refreshing recollection with review of document); *State v. Temoney*, 45 Md.App. 569, 414 A.2d 240 (1980), *vacated on other grounds*, 290 Md. 251, 429 A.2d 1018 (1981); *State v. McQueen*, 295 N.C. 96, 244 S.E.2d 414 (1978); *Creamer v. State*, 232 Ga. 136, 205 S.E.2d 240 (1974); *State v. Brom*, 8 Or.App. 598, 494 P.2d 434 (1972); *State v. Jorgensen*, 8 Or.App. 1, 492 P.2d 312 (1971).

Then in 1979, prompted by increased scientific studies and expert literature on hypnosis, judicial opinions became more analytical and more critical of hypnotically-induced testimony. In *Clark v. State*, 379 So.2d 372 (Fla.Dist.Ct.App.1979), the statements of a witness who testified under hypnosis in the courtroom were held inadmissible. Nevertheless, a witness' in-court statements about "recollections refreshed" by a hypnotic session terminated prior to the witness' courtroom appearance were held admissible if uninfluenced by

result of the hypnotic session .... Therefore, the victim's testimony was not rendered incompetent by the hypnotic session ...." *Id.,* 294 Pa.Superior Ct. at 178, 439 A.2d at 808.

5. As early as 1897 California held that the statements of a hypnotized criminal defendant could not be admitted as exculpatory evidence. *People v. Ebanks*, 117 Cal. 652, 49 P. 1049 (1897).

post-hypnotic suggestions. The credibility of such testimony was deemed the province of the fact-finder.

In *People v. Smrekar*, 68 Ill.App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (1979), *appeal denied*, 68 Ill.App.3d 379, 24 Ill. Dec. 707, 385 N.E.2d 848, the court found admissible testimony based upon recollections refreshed by hypnosis where (a) the hypnotic session was not unduly suggestive and (b) the witness' testimony was corroborated by other evidence unknown to the witness at the time of hypnosis. Again it was held that the fact-finder should determine the weight accorded to such testimony. In *State v. Greer*, 609 S.W.2d 423, 433–435 (Mo.App.1980), *vacated on other grounds*, 450 U.S. 1027, 101 S.Ct. 1037, 68 L.Ed.2d 222 (1981), the court determined that hypnotically-induced testimony would be inadmissible if the hypnotic session were impermissibly suggestive, but absent suggestiveness, the use of hypnosis to obtain testimony would affect the weight, but not the competence, of the evidence elicited.[6]

In *Polk v. State*, 48 Md.App. 382, 427 A.2d 1041 (1981), *cert. denied*, July 14, 1981, the Maryland intermediate appellate court gave substance to the framework provided in its 1968 opinion, *Harding*, by enumerating the indicia of reliability necessary for admissibility of hypnotically-elicited testimony. The court stated that if a trial court found hypnosis to be a generally accepted scientific technique,[7] the court

6. Finding the issue either waived or not yet ripe for discussion under the facts of the cases sub judice, two other courts have declined to decide the issue but have indicated some reluctance to admit hypnotically-induced testimony. *Commonwealth v. Juvenile*, 381 Mass. 727, 412 N.E.2d 339 (1980); *Merrifield v. State*, 400 N.E.2d 146 (Ind.1980).

7. In *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), where testimony was acquired by using a pioneer polygraph device, the court reasoned that the results of a scientific technique were admissible as evidence only if the technique itself were generally accepted in the field where it was employed. *Accord, Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977); *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981); *People v. Tait*, 99 Mich.App. 19, 297 N.W.2d 853 (1980); *State v. Mack*, 292 N.W.2d 764 (Minn.1980).

must ascertain whether the hypnotic session comported with the following criteria: (a) the hypnosis was conducted by a professionally qualified hypnotist; (b) no suggestive methods or materials were introduced during the hypnotic session, and (c) no post-hypnotic suggestions were given. If all three criteria were met, the trial court could admit the hypnotically-induced testimony and provide the jury with cautionary instructions regarding the manner in which the witness' testimony was obtained.[8]

Finally, in *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981), the court acknowledged that hypnotically-induced testimony often lacked reliability because (a) the hypnotized witness was as likely to produce fantasy as fact; (b) after hypnosis the witness was likely to remember as fact all testimony elicited through hypnosis, and (c) there were no means for detecting such mind imprints. Nevertheless, the court held that hypnotically-induced testimony could be admissible if the proponent of the testimony proved by clear and convincing evidence that "hypnosis was a reasonably reliable means of reviving [the witness'] memory comparable in its accuracy to normal recall." *Id.* at 97.

In *Nazarovitch* the Pennsylvania Supreme Court rejected the reasoning of *Hurd.* Having reviewed the current case law of many jurisdictions and several recent law review articles concerning hypnosis,[9] the court concluded:

> While we do not want to establish a *per se* rule of inadmissibility at this time, we will not permit the introduction of hypnotically-refreshed testimony until we are presented with more conclusive proof than has been of-

8. See Orne, *The Use and Misuse of Hypnosis in Court*, 27 Int'l J. of Clinical and Experimental Hypnosis 311 (1979), for a discussion of safeguards that would eliminate some suggestiveness surrounding hypnotic sessions.

9. See Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Cal.L.Rev. 313 (1980); Spector & Foster, *Admissibility of Hypnotic Statements: Is the Law of Evidence Suspectible?*, 38 Ohio L.J. 567 (1977).

fered to date of the reliability of hypnotically-retrieved memory.

*Commonwealth v. Nazarovitch*, 496 Pa. at 111, 436 A.2d at 178.[10] Thus, in Pennsylvania the court created a standard which will allow hypnotically-induced testimony to be admitted into evidence only upon proof of scientific developments eliminating the present unreliability of such testimony. *Accord, Polk.*

## CONCLUSION

■ Applying the foregoing standards to the facts of this case, we hold that the testimony of the witness was properly suppressed. The Commonwealth did not prove, *inter alia*, that hypnosis was generally accepted as a technique for obtaining reliable information and that the particular hypnotic session was free from prior, contemporaneous, or post-hypnotic suggestion. *See Commonwealth v. Nazarovitch*, 496 Pa. at 109, 436 A.2d at 177. On the contrary, both the hypnosis expert called by the Commonwealth and the hypnosis expert called by appellee testified that hypnotically-induced testimony was often unreliable. *Id.* Moreover, the instant hypnotic session was tainted by suggestions to the witness before, during, and after hypnosis.

**10.** In *Nazarovitch*
the Supreme Court did not approve any procedural safeguards which would insure the reliability and neutrality of memory refreshed by hypnosis .... The Supreme Court has, in effect, adopted a *pro se* rule of inadmissibility concerning hypnotically-refreshed testimony until the court is presented with more scientifically conclusive evidence that such testimony is reliable, to the same extent as testimony which is refreshed by reviewing a written document.
*Commonwealth v. Taylor*, 294 Pa.Super.Ct. 171, 174 n.1, 439 A.2d 805, 807 n.1 (1982).