502 A.2d 606

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Louis Paul DiNICOLA, Appellee.**

Superior Court of Pennsylvania.

Argued May 15, 1985.

Filed Dec. 20, 1985.

---

406

Timothy J. Lucas Assistant District Attorney, Erie, for Com., appellant.

Ramsey Clark, Erie, for appellee.

Before SPAETH, President Judge, and ROWLEY and WIEAND, JJ.

WIEAND, Judge:

An appeal by the Commonwealth from an order partially suppressing testimony of a hypnotically refreshed witness requires that we review and apply recent decisions to determine the admissibility of testimony from such a witness. The trial court suppressed the testimony of Deborah Sweet, a Commonwealth witness, to the extent that such testimony

could not be verified by a prehypnotic statement made by the witness. We affirm.

On August 30, 1979, a fire consumed Deborah Sweet's apartment in a two-story building in Erie, killing her two young children and an upstairs neighbor. Sweet, together with Michael Jefferson and the appellee, Louis P. DiNicola, had spent the evening in Sweet's apartment, drinking beer, smoking marijuana and talking. As a result of the evening's events, DiNicola was charged with arson and three counts of murder. A jury found him guilty of arson and murder of the second degree. His conviction was affirmed by the Superior Court, *Commonwealth v. DiNicola,* 308 Pa.Super. 535, 454 A.2d 1027 (1983). However, the conviction was subsequently reversed by the Supreme Court because the jury had been allowed erroneously to hear evidence of an opinion by an assistant district attorney that DiNicola had set the fire. See: *Commonwealth v. DiNicola,* 503 Pa. 90, 468 A.2d 1078 (1983).

Upon remand, the defendant learned for the first time that Deborah Sweet had been hypnotized prior to trial. She had originally given the Erie Police Department a tape recorded statement on September 6, 1979. A second statement had been given to the police on September 14th. On September 17th, the witness voluntarily submitted to hypnosis, and a tape recording was made of the hypnotic interview. The tape, however, was either lost or destroyed. Only a portion of a transcript made from the tape remains. Because the witness' testimony had been hypnotically refreshed, DiNicola filed a pre-trial motion to suppress her testimony.[1] The trial court granted appellee's motion to suppress in part. The court's order, dated September 24, 1984, provided that "Ms. Sweet is precluded from testifying at the trial of this case about the circumstances surrounding the fire which consumed her apartment on August 30, 1979, except to the extent that her testimony is the same as

---

1. He also filed a motion to dismiss based upon double jeopardy; the court's denial of that motion has been affirmed by this Court. See: *Commonwealth v. DiNicola,* 348 Pa.Super. 401, 502 A.2d 604 (1985).

her recollections recorded on the cassette tape of September 6, 1979." The Commonwealth has appealed from this order.[2]

The standard of review is well established.

> Our responsibility on review is "to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings." ... In making this determination, this Court will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.

*Commonwealth v. Lark*, 505 Pa. 126, 129, 477 A.2d 857, 859 (1984), quoting *Commonwealth v. Kichline*, 468 Pa. 265, 279, 361 A.2d 282, 290 (1976) (citations omitted). See also: *Commonwealth v. Scatena*, 332 Pa.Super. 415, 433, 481 A.2d 855, 864 (1984); *Commonwealth v. Chamberlain*, 332 Pa.Super. 108, 112, 480 A.2d 1209, 1211 (1984).

The record in this case discloses that a fire of incendiary origin erupted on August 30, 1979 in a downstairs apartment occupied by Deborah Sweet and her two children. Present at the time of the fire were Michael Jefferson, an acquaintance of Deborah Sweet, and Louis P. DiNicola, a companion of Jefferson who had been previously unknown to Sweet. During the course of the evening, the threesome drank beer and smoked marijuana. Sweet and Jefferson, at some point in time, retired to Sweet's bedroom where they engaged in sexual intercourse. During this period of time DiNicola was left alone. Sweet and Jefferson fell asleep. They awakened to find the apartment engulfed in flames. Sweet, Jefferson, and DiNicola escaped, but Sweet's two children and an upstairs neighbor perished.

---

2. In this appeal the Commonwealth has certified that the order in question substantially handicaps the prosecution. Therefore, its appeal is properly before us. *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985); *Commonwealth v. Sheppard*, 341 Pa.Super. 403, 491 A.2d 879 (1985).

    The defendant has also filed a cross-appeal from the order. As to the defendant, however, the order is clearly interlocutory.

On September 6, 1979, while a patient at St. Vincent's Health Center, Sweet gave a statement to police officers, which was tape recorded.[3] In that statement she said that after she had put her children to bed and after the threesome had consumed beer and smoked marijuana, she received a long distance telephone call, which she took in the living room. At that time, she said, she had heard a commotion in the kitchen where the two men then were located. When she got off the phone, about 10:35 p.m., DiNicola used her bathroom to shower and clean up, and Sweet and Jefferson went to her bedroom and engaged in sexual intercourse. While in the bedroom, with the door open, Sweet observed DiNicola leave the bathroom. Sweet said that thereafter she had heard fumbling around which was going on in other portions of the apartment. She said that she had voiced her concern about this to Jefferson, who attributed it to DiNicola's drunkenness and said there was nothing to worry about. They dozed off thereafter, only to awaken to find the bedroom filled with smoke. Sweet and Jefferson ran from the bedroom, saw that the apartment was in flames, and heeded a warning from DiNicola to get out of the apartment. Police officers who interviewed Sweet on September 6th also prepared a three page typewritten police report which summarized Sweet's testimony. The information in this report was substantially, but not precisely, the same as that contained in the tape recording. In the taped interview, Sweet said that she had returned home around 8:30 p.m. on the night of the fire; the police report suggests that she said 6:30 p.m. Sweet said during her interview, as tape recorded, that the marijuana had been very strong, that it might have had something else in it; the report refers to her guess that the marijuana had been laced with angel dust. Sweet was again questioned by police on September 14th. All that remains of that interview is a five page typewritten report prepared by the police and detailing her recollections. It differs only slight-

3. This statement was not disclosed to the defense until April 17, 1984, after the case had been reversed and remanded for a new trial by the Supreme Court.

ly from the earlier tape recording and police report. One notable difference, however, is that on September 14, Sweet was reported to have told police that while she and Jefferson had been in her bedroom she heard DiNicola leave the apartment.

On September 17, Sweet voluntarily underwent hypnosis. The hypnotic interview was conducted by William Vorsheck, a hypnotist who regularly assisted the Erie Police Department. Although the hypnotic interview was tape recorded, only a portion of a transcript made from the tape recording remains. Under the hypnotic technique of calendar age regression, the witness made several statements pertaining to the events of September 6 which she had been unable to "recall" prior to hypnosis. She elaborated upon the noises heard while she was in her bedroom, tracing the source of the sounds and noting that appellee had been heard leaving the apartment and returning a short time later. She also was reported to have said that DiNicola had given her a "shotgun"[4] with a marijuana cigarette and then tried to make a pass. The pass, she said, had been rejected.

At the first trial, Sweet testified as a Commonwealth witness. Included in her testimony were facts which had been "recalled" during hypnosis. Neither the fact of hypnosis nor the variance in her recall thereafter had been disclosed to the defense prior to or during trial.

The Commonwealth argues on appeal that the trial court erred in (1) excluding the witness' posthypnotic testimony; and (2) in excluding testimony of facts recalled prior to hypnosis. We disagree.

The law regarding the use of hypnotically retrieved and refreshed testimony in this Commonwealth was recently reviewed by this Court in *Commonwealth v. Romanelli*, 336 Pa.Super. 261, 485 A.2d 795 (1984). The applicable law may be summarized as follows.

---

4. A "shotgun" was described as putting the lighted end of a cigarette in one's mouth and blowing air through it into another person's mouth at the other end of the cigarette.

In *Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981), where the witness had no recollection of the facts prior to hypnosis, the Supreme Court said that it would "not permit the introduction of hypnotically-refreshed testimony until ... presented with more conclusive proof than has been offered to date of the reliability of hypnotically-retrieved memory." *Id.*, 496 Pa. at 111, 436 A.2d at 178.

The Superior Court next held, in *Commonwealth v. Taylor*, 294 Pa.Super. 171, 439 A.2d 805 (1982), that a witness' identification testimony would be received where the witness had identified the perpetrators prior to the hypnotic session. This Court held that "with respect to the victim's ability to identify her two assailants, the hypnotic session did not, in fact, refresh her memory, and the dangers of unreliable suggestion, fantasy and confabulation are not at issue." *Id.*, 294 Pa.Superior Ct. at 177, 439 A.2d at 808.

In *Commonwealth v. McCabe*, 303 Pa.Super. 245, 449 A.2d 670 (1982), the Superior Court held that *hypnotically-induced* identification of the appellant had been properly suppressed where the Commonwealth had failed to prove "that the particular hypnotic session was free from prior, contemporaneous, or post-hypnotic suggestion." *Id.*, 303 Pa.Superior Ct. at 258, 449 A.2d at 677.

The issue of hypnotically induced testimony next came before the Supreme Court in *Commonwealth v. Smoyer*, 505 Pa. 83, 476 A.2d 1304 (1984). The Court held that testimony induced by hypnosis was inadmissible. With respect to testimony verified by statements made prior to hypnosis, the Court suggested a standard for determining its admissibility as follows:

> whenever a person previously hypnotized is offered as a witness, the offering party must so advise the court, and *show that the testimony to be presented was established and existed previous to any hypnotic process;* that the person conducting the hypnotic session must be trained in the process and is neutral of any connection with the issue or the parties; and, the trial judge shall instruct the

jury that the testimony of a witness previously hypnotized should be carefully scrutinized and received with caution.

*Id.*, 505 Pa. at 89–90, 476 A.2d at 1308 (footnote omitted) (emphasis added).

In *Commonwealth v. Romanelli, supra,* this Court held that "[i]t is enough to render the victim's testimony admissible that her recollection of the facts had been established and existed prior to any hypnotic process. The hypnotic process will not per se invalidate the competency of impressions originally received by the senses." *Id.* 336 Pa.Super. at 270, 485 A.2d at 799. In *Romanelli,* this Court upheld the receipt of testimony from a victim of a rape, who had testified to the details of the rape and identified her assailant. Even though she had not identified her attacker prior to hypnosis, she had given an accurate description of him. When she subsequently observed her attacker, she identified him immediately and positively. This Court said:

> [t]he victim of a crime who has a vivid and precise recollection of her attacker, who has observed him for a protracted period in broad daylight and possesses a clear, independent, mental image of her assailant's appearance will not be rendered incompetent to testify when she finds again the man who attacked her merely because, in the interim, she subjected herself to nonsuggestive hypnosis.

*Id.*

Consistently running through the Pennsylvania decisions is the concept that where a witness has made an identification, given a statement, or testified prior to a hypnotic interview, the fact that the witness later undergoes hypnosis does not render incompetent that testimony which is consistent with the witness' prehypnotic recollection.

Other jurisdictions have reached the same conclusion. See: *People v. Guerra,* 37 Cal.3d 385, 690 P.2d 635, 208 Cal.Rptr. 162 (1984) (reaffirming the introduction at trial of preliminary hearing testimony); *People v. Quintanar,* —— Colo.App. ——, 659 P.2d 710 (1982) (prehypnosis recollections recorded by tape recording, videotape, or written statement

admissible); *Bundy v. State*, 471 So.2d 9 (Fla.1985) (testimony as to those facts demonstrably recalled prior to hypnosis admissible); *Pearson v. State*, Ind., 441 N.E.2d 468 (1982) (may testify to matters recalled and related prior to hypnosis); *State v. Seager*, 341 N.W.2d 420 (Iowa 1983) (trial testimony substantially the same as prehypnotic statements admissible); *State v. Haislip*, 237 Kan. 461, 701 P.2d 909 (1985) (testimony as to facts related before hypnosis admissible); *State v. Goutro*, 444 So.2d 615 (La.1984) (same); *Simkus v. State*, 296 Md. 718, 464 A.2d 1055 (1983) (testimony in accord with statements clearly made prior to hypnosis admissible); *Commonwealth v. Kater*, 388 Mass. 519, 447 N.E.2d 1190 (1983) (testimony as to prehypnotic memory admissible under certain guidelines); *People v. Gonzales*, 415 Mich. 615, 329 N.W.2d 743 (1982) (prehypnotic testimony preserved by hypnosis admissible); *Rodriguez v. State*, 345 N.W.2d 781 (Minn.App.1984) (prehypnotic recall testimony admissible upon certain proof); *House v. State*, 445 So.2d 815 (Miss.1984) (prehypnosis testimony admissible where certain minimum safeguards have been met); *State v. Patterson*, 213 Neb. 686, 331 N.W.2d 500 (1983) (upon proof that evidence was known and related prior to hypnosis, prehypnosis testimony admissible); *State v. Hutchinson*, 99 N.M. 616, 661 P.2d 1315 (1983) (prehypnotic testimony admissible at trial court's discretion); *People v. Hughes*, 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (1983) (testimony as to events recalled prior to hypnosis admissible); *State v. Payne*, 312 N.C. 647, 325 S.E.2d 205 (1985) (same); *Harmon v. State*, 700 P.2d 212 (Okla.Crim. 1985) (testimony as to facts demonstrably shown to have been recalled prior to hypnosis admissible); *State v. Martin*, 101 Wash.2d 713, 684 P.2d 651 (1984) (testimony as to prehypnotic memory admissible). Accord: *People v. Gibson*, 117 Ill.App.3d 270, 72 Ill.Dec. 672, 452 N.E.2d 1368 (1983); *State v. Williams*, 662 S.W.2d 277 (Mo.App.1983); *State v. Brown*, 337 N.W.2d 138 (N.D.1983).

■ Intervening hypnosis does not render a witness incompetent to testify to those facts demonstrably recalled

prior to hypnosis. Where prior recall can be demonstrated, the fear of confabulation and fantasizing as a result of hypnosis is not present. Under such circumstances, the accuracy of the witness' testimony remains untainted by subsequent hypnosis.

DiNicola suggests that the court's order is unworkable and that hypnosis has rendered the witness impervious to cross-examination. It may be that enforcement of the court's suppression order will require careful monitoring during trial to avoid a narrative based upon an expanded recollection. However, this fact alone does not require the exclusion of the entirety of the witness' testimony. The subsequent hypnosis of the witness does not justify the total and irrevocable silencing of one who has been shown to have direct knowledge of relevant facts, uninduced by hypnosis. The suppression court found that the *Smoyer* safeguards had been met, and we find no basis on which to disagree. Indeed, most courts which have considered the issue would allow testimony regarding facts recalled by the witness prior to hypnosis.

It remains for us to determine, however, the reliability of the various means by which a witness' prehypnosis recollection can be established. In this case, the suppression court held that the witness would be permitted to testify to those facts which demonstrably she had been able to recall prior to hypnosis. The court required that the Commonwealth prove her prehypnotic recollection by verbatim statements made by the witness and refused to accept as adequate proof of prehypnotic recollection such reports as had been prepared by police and neither signed nor previously reviewed by the witness. We find no error in this ruling.

With respect to police summaries of the witness' interviews of September 6 and September 14, the suppression court found that "[t]he Commonwealth has failed to sufficiently establish that the police reports are accurate renditions of Ms. Sweet's pre-hypnotic recollections." (Trial

court opinion of September 24, 1984 at p. 5). Citing two instances in which the reports differed from the tape recording of the September 6 interview, the court concluded "because of the second hand nature of the information contained in the police reports, not only would we have to contend with Ms. Sweet's recollections, but we would also have to contend with the vagaries of the police officers' memories." *Id.* at 6.

The Supreme Court, in *Commonwealth v. Smoyer, supra,* required proof that the witness' testimony existed prior to hypnosis before it could be received. The reason for this requirement, as we have observed, was to protect against pitfalls inherent in hypnosis, i.e., confabulation, fantasy, and suggestiveness. Among the methods available for recording prehypnotic statements of witnesses are tape or video tape recordings and signed statements. These means for perpetuating the witness' recollection are reasonably reliable and permit a court to determine definitively the scope of a witness' prehypnotic recollection. They provide means for verifying a witness' prehypnosis recollection which are independent of and safeguarded against vagaries inherent in recollections which exist solely in the memories of persons interested in the investigation.

■ Of course, there may be other means by which a witness' prehypnotic recollection can adequately be verified. Nevertheless, the standard of verification must be high and in keeping with recognized dangers presented by a hypnotically refreshed recollection. We hold, therefore, that before a hypnotically refreshed witness can testify to his or her prehypnotic recollection, the witness' prehypnotic recollection must be verified by evidence which is clear and convincing. See: *Rodriguez v. State,* 345 N.W.2d 781, 786 (Minn.App.1984); *People v. Hughes,* 59 N.Y.2d 523, 547, 466 N.Y.S.2d 255, 267, 453 N.E.2d 484, 497 (1983); *Strong v. State,* Ind. 435 N.E.2d 969, 970–971 (1982).

In *Commonwealth v. Mehmeti,* 347 Pa.Super. 278, 500 A.2d 832 (1985), this Court permitted witnesses to testify to prehypnotic recollections of facts which had been demon-

strated by written notes of an investigating police officer. In that case, however, the accuracy of the police officer's notes was not disputed. Moreover, the Superior Court did not there purport to establish general standards by which to determine the reliability of evidence intended to establish the scope of a witness' prehypnotic recollection.

In the instant case, the suppression court found that the Commonwealth had failed to establish that police reports containing police recollections of interviews with the witness on September 6 and 14 were accurate statements of Sweet's prehypnotic recollections. Our review of the record discloses no basis for interfering with the court's findings. The police reports contained investigators' recollections of statements made by the witness and may or may not have been recorded contemporaneously with the interview. In any event, before these reports could be used to verify the witness' prehypnotic recollection, it was essential that the accuracy and reliability of the reporter's recollection be established. In the instant case, this was done only to the extent that police reports were consistent with the tape recording of the September 6 interview. The suppression court could properly rely on the tape recording in limiting the scope of the witness' testimony at trial.

During hypnosis, the witness described in greater detail the condition of the clothing worn by DiNicola, the substance of the long distance telephone conversation, the music emanating from a stereo set, and the conversation had with Jefferson while DiNicola was taking a shower. She also elaborated on DiNicola's movement, the noises she heard in the apartment, DiNicola's footsteps, and the children's negative reactions to DiNicola. Testimony regarding these additional facts was properly excluded. The risk of confabulation and suggestiveness as a consequence of the hypnotic session confirm the suppression court's determination to exclude such testimony.

Order affirmed.