Commonwealth *v.* Fairbanks, Appellant.

Argued April 21, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, NIX and MANDERINO, JJ.

*H. L. Anderson,* with him *Anthony D. Pirillo, Jr.,* for appellant.

*Romer Holleran,* Assistant District Attorney, with him *Milton M. Stein,* Assistant District Attorney, *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE MANDERINO, July 2, 1973:

The appellant, Robert Fairbanks, was convicted of murder in the second degree on October 21, 1970. Post-trial motions were denied and the appellant was sentenced to serve nine to eighteen years' imprisonment. This appeal followed. The judgment of sentence is reversed and a new trial granted because the prosecutor introduced hearsay evidence which was highly prejudicial and may have been most significant in the jury's deliberations and their consideration of the appellant's guilt or innocence. The hearsay evidence was first mentioned in the prosecutor's opening statement. References to that evidence continued throughout the trial, including references in the prosecutor's closing argument. Immediately upon discovering that the highly prejudicial evidence was based on hearsay, defense counsel objected but was overruled by the trial court. His motions for a mistrial were also denied. The hearsay evidence was highly significant in supplying a motive, without which, there would have been a significant gap in the prosecution's theory of the killing.

The prosecution and the defense agreed on many facts. During the early morning of April 5, 1970, after

the normal closing hour of taverns, a party was in progress at an apartment located on the first floor at 2518 Federal Street in Philadelphia. Walter and Josephine Hudgins were hosting a party at which at least fifteen (perhaps thirty) people were present. Nathaniel Swint was in attendance at the party for awhile and then left. Before his departure, an argument took place between him and the appellant. It began when Nathaniel Swint made a remark about holding somebody up.

Some time later, Nathaniel Swint returned to the apartment with his brother, Robert Swint. They were admitted to the apartment. Almost immediately gunfire broke out. Robert Swint was killed and Nathaniel Swint and Walter Hudgins were wounded. The prosecution and the defense differed sharply as to what precipitated the gunfire.

The prosecution claimed that Nathaniel Swint had initially gone to the party to collect $700, which Walter Hudgins owed him for cocaine. Nathaniel Swint admitted that he made a remark at the party about holding somebody up which precipitated the argument with the appellant. He testified, however, that his remark was made in jest and that he was surprised when the appellant and others took him seriously. He also testified that during the argument the appellant pulled out a .38 revolver but nothing happened. Walter Hudgins, who had been upstairs during the argument, then came down, walked with Nathaniel Swint outside the apartment, and told him to return later for the $700. Nathaniel Swint said that he met his brother, Robert Swint, thereafter, and they both returned to the apartment in order to collect the $700. They were admitted to the apartment and walked through the hallway leading to the dining room. As Robert Swint, who was in the lead, reached the dining room, he was shot several

times without warning and fell to the dining room floor. Nathaniel Swint was also shot, but managed to crawl outside.

The defense version is entirely different. According to defense witnesses, when Nathaniel Swint was first at the party, he told several people he needed money badly and asked for assistance. He also made belligerent and aggressive remarks to some of the people at the party. He mentioned, at one point, a stick-up and at another point told a woman that he would shoot her man if he saw him. He then made a remark to a man at the party, who was counting money, that he would hold him up, if he weren't in so much trouble already. Nathaniel Swint had been convicted of second degree murder, arising out of a totally unrelated incident, and had been released on bail ten days prior to the morning of the party. He had not yet been sentenced. Defense witnesses agreed that an argument occurred after Nathaniel Swint's remarks about a holdup, but denied seeing the appellant pull out any gun. They agreed that Nathaniel Swint left the party shortly thereafter.

According to defense witnesses, when Nathaniel Swint returned with his brother, Robert Swint, they heard the doorbell and Walter Hudgins went to answer the door. Almost simultaneously gunfire began. Walter Hudgins was wounded along with Nathaniel Swint, and Robert Swint was killed. According to the defense version, the appellant shot Robert Swint and Nathaniel Swint in self-defense because they had returned to the apartment with guns and began shooting.

The prosecution and the defense thus sharply differed on what happened immediately before the shooting began and who initiated the shooting. In order for the jury to have accepted the prosecution's version, it was important for the prosecution to provide evidence

to explain the appellant's shooting at Robert and Nathaniel Swint when they returned to the apartment.

In his opening remarks, the prosecutor, in outlining the evidence he intended to offer, stated the following:

". . . the reason [the appellant] was there, members of the jury, *as you will hear testimony* is that his function and that his purpose is that he is known as *an enforcer.* He is an executioner for a group that's loosely called the term or termed the *Black Mafia.* So [the appellant] was there to see, as part of his duties, that everything runs smoothly. He is what we refer to as a *gentleman executioner.* . . .

". . . .

". . . well now, naturally [the appellant] was *the enforcer* and whose reputation and life style depends on everyone viewing him in terror, in fear, had to make what we call his move. . . .

". . . .

". . . his whole reputation rests on the fact that he is supposed to be *an executioner.* . . ." (Emphasis supplied.)

In his opening statement, the prosecutor also said: ". . . the two brothers walk through the vestibule which is about five feet in length; past the living room and when they're in the middle, approximately the middle of the dining room, they realize that they have entered into a cold and cruel, vicious ambush. They walk right into a death trap because there aren't any people around anymore. All of a sudden, being at his wit's end, all Nate hears are shots coming from every direction and all of a sudden he sees his brother begin to fall. And as he looks forward, no more than eight feet away he sees Mr. Fairbanks, Bop-Daddy, *the enforcer, the executioner,* standing behind the kitchen wall firing a .38 caliber at his brother and then firing at him. They

walked right into a death trap, two unprotected, unarmed young men, never expecting anything. . . ." (Emphasis added.)

The prosecutor's remarks in his opening statement must be "fair deductions from evidence expected to be presented." His remarks cannot be "mere assertions intended to inflame the passions of the jury." *Commonwealth v. Meyers*, 290 Pa. 573, 580, 139 A. 374, 377 (1927); *Commonwealth v. Hoffman*, 439 Pa. 348, 354, 266 A. 2d 726, 730 (1970).

The American Bar Association Standards for Criminal Justice provide the following standard for the prosecutor: "In his opening statement the prosecutor should confine his remarks to evidence he intends to offer which he believes in good faith will be available and admissible and a brief statement of the issues in the case. It is unprofessional conduct to allude to any evidence unless there is a good faith and reasonable basis for believing that such evidence will be tendered and admitted in evidence." ABA Project on Standards for Criminal Justice, Standards Relating to The Prosecution Function and The Defense Function, §5.5 (Approved Draft, 1971).

In his opening statement, the prosecutor should be scrupulous to avoid any utterance he cannot support later with such evidence. ABA Standards, supra, Commentary to §5.5.

The prosecutor was thus obligated to fulfill the evidentiary promises that he made in his opening statement. Only one witness was presented to provide a basis for the prosecutor's opening remarks. That witness was Nathaniel Swint, who testified in answer to the prosecutor's questions, as follows: "Q. Who did he work for? A. The Black Mafia. Q. What was his job? A. Executioner."

The testimony of Nathaniel Swint was proper testimony unless it was inadmissible hearsay evidence.

Whether it was or not, the prosecutor would have known when he asked the questions. Nathaniel Swint was his witness. In view of the prosecutor's opening statement, he must have discussed this testimony with the only witness who offered such testimony. On its face, the testimony would not appear as hearsay evidence to defense counsel or to the trial court.

In view of the prosecutor's emphasis in his opening statement on the appellant's alleged employment, Nathaniel Swint's positive testimony must have created a significant indentation of persuasion in the jury's mind. It appeared to do so in the trial judge's mind. Shortly after Nathaniel Swint's testimony, and before defense counsel's cross-examination, the trial judge, completely out of context, and for no apparent reason, commented as follows: ". . . He has said that your client, Mr. Fairbanks was known as *the executioner* around here and all that. *I mean, that's the happening.*" (Emphasis supplied.)

There is no explanation evident from the record as to why the trial court decided to emphasize the remark about the appellant being *the executioner* or why the trial court added his positive statement ". . . *I mean, that's the happening.*"

Defense counsel first became aware that the evidence was hearsay during his cross-examination of Nathaniel Swint. During that cross-examination, the following colloquy occurred: "Q. Now, at that point where you used that language to Robert Fairbanks, did you know at that point that he was an executioner? A. *I had heard.* Q. You had heard? A. Yes. Q. Do you know? A. You mean for a fact? Q. Yes. A. *Not as a fact.* MR. D'ANGELO: If Your Honor please, the statement by the witness was—THE COURT: Well, in order to offset you, you are objecting to his statement. I will allow it and you have an exception. You asked him.

That's the end of that. MR. D'ANGELO: And I will now move for a mistrial, Your Honor, based on—THE COURT: And that's denied and you have an exception. Q. What do you know about *the Black Mafia?* A. When I was in Holmesburg, *I was reading the paper about it and I read some articles.* Q. You read some articles about *the Black Mafia* in a newspaper in Holmesburg? A. Yes. Q. Do you have any other information about *the Black Mafia?* A. Yes. Q. What is the source of your other information? A. When I was out on the streets, that's all you would hear about the news that was around there; they had handled all the drugs. Q. And do you have any actual knowledge of this other than what you heard on the streets? A. *Not hard-down facts.* Q. No hard facts? A. *Correct.* Q. Just *what you read* at Holmesburg and *what you heard on the street?* A. *That is correct.* Q. *You have no actual knowledge* about the Black Mafia; *you have no personal knowledge* of this; is that so? A. *That is correct.* Q. And *you have no personal knowledge about who the executioners would be;* is that so? A. *No, I don't. I only said I heard.* MR. D'ANGELO: Again, Your Honor, I move for a mistrial in this case. The statement—THE COURT: That's denied and you have an exception. Let's go ahead." (Emphasis added.)

Defense counsel objected immediately when he discovered that Nathaniel Swint's testimony was hearsay. His objections should have been sustained and the hearsay evidence stricken from the record. The prosecutor should not have alluded to this hearsay evidence in his opening statement. There is nothing in the record to indicate that a good faith and reasonable basis existed for the prosecutor's evidentiary promises in his opening statement.

Had the trial court ordered the hearsay evidence stricken and properly cautioned the jury, perhaps the

error could have been corrected. This is not what occurred, however.

When the prosecutor was cross-examining the first defense witness, the following colloquy occurred: "Q. Who does he work for? A. I don't know. Q. Doesn't he work for the *Black Mafia?* A. What is the Black Mafia? MR. D'ANGELO: *Objection, Your Honor.* THE COURT: Well, that's been used around here." (Emphasis supplied.)

The above exchange took place after the trial court had ruled that such references were proper. When the court commented ". . . Well, that's been used around here. . . ." The trial court had to be referring to the prosecutor. Defense counsel wanted such references stricken but was overruled.

During the cross-examination by the prosecutor of another defense witness, the hearsay evidence was again injected into the trial by the prosecutor with the trial court's approval.

"Q. Now, at the time that this happened on April 5th, 1970, wasn't Mr. Fairbanks *an enforcer, an executioner* for *the Black Mafia?* A. Not as I know he wasn't. Q. Excuse me? A. No, he wasn't. Q. You're saying he wasn't? A. I say, he wasn't. Q. How do you know he wasn't? MR. D'ANGELO: *Objection, Your Honor.* Q. Tell the jury how you know that he wasn't. MR. D'ANGELO: *Objection, Your Honor.* THE COURT: Well, he said he wasn't. I think he has a right now to ask him how he knows that. MR. D'ANGELO: Your Honor, he is asking—THE COURT: Well, I will permit him to answer the question. Q. Mr. Jones, tell this jury how you know he wasn't. A. Because I've known him since sixteen years and he's a personal friend of mine and I know *he's no enforcer for no Black Mafia* or whatever you call it. Q. Have you ever heard of *the Black Mafia?* A. I have heard them talk about it. . . . Q. You're telling

this jury that *you are sure that he is not an executioner for the Black Mafia?* A. I know he's not. . . . Q. Do you know a Walter Hudgins? A. Yes, I do. Q. And is he *a member of the Black Mafia?* MR. D'ANGELO: *Objection, Your Honor."* (Emphasis supplied.)

The prejudicial effects of the hearsay testimony were intensified each time the trial court allowed repetitive references by the prosecutor to the Black Mafia and to the appellant's job as an enforcer or executioner.

The intensification of the prejudice by reference to the hearsay testimony continued during the prosecutor's closing argument to the jury as he persuasively tied together his version of the killing. Such references were important in the prosecutor's closing argument, in order to establish in the jury's mind a plausible motive for the ambush of the Swint brothers, by the appellant lying-in-wait. The prosecutor referred to the killing as a *planned assassination.* He referred to the apartment at the time the Swint brothers returned as a *death trap.* He told the jury that ". . . Nate Swint . . . faced down Bop-Daddy [the appellant], *the executioner,* in front of his whole crowd. Remember, they were the older crowd, Jimmy Lee Davis; an older woman; Bop-Daddy. It was his [the appellant's] birthday. Can you imagine it on his birthday with his reputation as *the executioner,* the tough guy from the *Black Mafia. . . ."* (Emphasis supplied.)

The prosecutor wanted the jury to believe that the appellant had lost face during his argument with Nathaniel Swint at the party. He wanted the jury to further believe that the appellant had no alternative if he was to preserve his reputation as the executioner, as the tough guy from the Black Mafia, except to plan an assassination and organize a death trap for Nathaniel Swint when Swint returned to the party.

The prosecutor's theory would have lacked credence if the appellant had not been portrayed as a tough guy from the Black Mafia who worked as an executioner or enforcer. The level of credibility obviously went up by persuading the jury that a Black Mafia enforcer had to kill to save his reputation.

The theme concerning appellant's membership in the *Black Mafia* and his job as *enforcer* or *executioner* recurred often during the trial. It was the key theme of the prosecution when the case began and continued as the key theme until the jury retired. The theme was introduced deliberately by the prosecution and allowed by the trial court. It was important to the prosecution because without that theme the jury would have been left with two diametrically opposed versions of the killing without a satisfactory basis as to why the appellant and others at the party were lying-in-wait for Nathaniel Swint to return to the apartment.

The highly prejudicial error in this case was further magnified by the application of more extreme caution by the trial court and the prosecution in protecting the reputation of Nathaniel Swint, when defense counsel attempted to establish that Nathaniel Swint, one of the alleged aggressors, had a poor reputation as a peaceful, law-abiding person. During the direct examination of Catherine Walker, who was present at the party when Nathaniel Swint was there the first time, the following colloquy occurred: "Q. Now, you have known Nate Swint for a period of how long? A. Five or six years. Q. And do you know other people who know him? A. Yes. Q. And among those people who know him, do you know what his reputation is? A. He's a terror. He's always looking for trouble. MR. LEVINE: Objection. Just a minute, Mrs. Walker. That's totally objectionable. THE COURT: I think so. MR. D'ANGELO: If Your Honor please—MR. LEVINE: I think Your Hon-

or has ruled. THE COURT: There is an objection and I think it's objectionable in terms of the question you asked this lady and you have an exception. Q. What is his reputation among those people—MR. LEVINE: Objection. Q. —as a peaceful, law-abiding citizen? MR. LEVINE: Objection, if Your Honor please. THE COURT: Are you objecting to it? MR. LEVINE: Yes. THE COURT: I will sustain the objection and you have an exception. Q. What is his reputation for truth and veracity? MR. LEVINE: Objection. I think Your Honor has ruled. THE COURT: The objections are well taken to any questions of that import and you have an exception. MR. D'ANGELO: Is Your Honor ruling I may not—THE COURT: I have made a ruling and you have an exception, that's right."

The trial court would not permit testimony concerning whether Nathaniel Swint was a peaceful, law-abiding citizen (even though his alleged aggression was the key to the defense); nor would the trial court permit testimony concerning Nathaniel Swint's truth and veracity (even though he was the prosecution's key witness)—but the court freely permitted the inadmissible hearsay references to the appellant as an enforcer or executioner for the Black Mafia.

Appellant was entitled to a fair trial. He did not receive one.

Judgment of sentence is reversed and a new trial granted.

Mr. Chief Justice JONES and Mr. Justice NIX concur in the result.

Mr. Justice POMEROY took no part in the consideration or decision of this case.