583 A.2d 459

COMMONWEALTH of Pennsylvania

v.

Samuel Ray REED, Appellant.

Superior Court of Pennsylvania.

Argued March 8, 1990.

Filed Dec. 6, 1990.

208

210

Deborah Tetzlaff Lux, Asst. Public Defender, Bellefonte, for appellant.

M. Eileen Tucker, Asst. Dist. Atty., Bellefonte, for Com.

Before WIEAND, TAMILIA and POPOVICH, JJ.

WIEAND, Judge:

Samuel Ray Reed was tried by jury and was found guilty of murder in the third degree in connection with the February 11, 1988 shooting death of his brother-in-law. Post-trial motions were denied, and Reed was sentenced to serve a term of imprisonment for not less than ten (10) years nor more than twenty (20) years. A motion to modify sentence was also denied. Reed then filed the instant appeal in which he argues that the trial court erred: (1) by denying his motion to suppress evidence; (2) by admitting into evidence, over defense objection, certain photographs, autopsy slides and physical evidence; (3) by refusing to admit into evidence statements made by him under hypnosis; (4) by refusing to declare a mistrial because of prosecutorial misconduct during closing argument; and (5) by refusing to charge the jury on the elements of involuntary manslaughter. Reed also asserts that the trial court abused its discretion when it imposed the maximum sentence authorized by law for third degree murder. We will consider these arguments seriatim.

Appellant first contends that all oral and written statements which he gave to the police should have been suppressed because he was subjected to custodial interrogation without first having been advised of his *Miranda*[1] rights and because police failed to stop questioning him after he asserted his right to counsel. In reviewing the trial court's denial of appellant's suppression motion, we must

> 'determine whether the factual findings of the [suppression] court are supported by the record. In making this determination, we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense, as, fairly read in the context of the record as a whole, remains uncontradicted. If, when so viewed, the evidence supports the factual findings, we are bound by such findings and may only reverse if the legal conclu-

---

**1.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

sions drawn therefrom are in error. *Commonwealth v. Trenge*, 305 Pa.Super. 386, 451 A.2d 701 (1982).' *Commonwealth v. Schneider*, 386 Pa.Super. 202, 206, 562 A.2d 868, 870 (1989), quoting *Commonwealth v. Chamberlain*, 332 Pa.Super. 108, 112, 480 A.2d 1209, 1211 (1984). See also: *Commonwealth v. Kichline*, 468 Pa. 265, 280–281, 361 A.2d 282, 290 (1976); *Commonwealth v. Stark*, 363 Pa.Super. 356, 365, 526 A.2d 383, 388 (1987).

After the victim's body had been discovered, police conducted interviews with members of the victim's family and obtained information which caused their investigation to focus on appellant, the victim's brother-in-law. At or about 9:30 p.m. on February 12, 1988, the evening following the murder, Lieutenant Joseph Holmberg and Corporal Jeffrey Watson of the Pennsylvania State Police went to appellant's home for the purpose of questioning him and executing a search warrant for his home. Upon being admitted by appellant's wife, Holmberg asked appellant if he was willing to talk to the police. Appellant consented and led Holmberg and Watson into the kitchen, where they sat at the kitchen table. Holmberg told appellant that the police were not there to arrest him, that he did not have to answer any questions and that at any time he desired he could tell the police to leave his home. Appellant's wife was permitted to be present during the questioning. In response to police questioning, appellant said that he had had a few beers with the victim on the previous evening, but had left the victim at the bar when he returned to his home. The police asked appellant if he owned a gun, and appellant replied that he owned a .357 revolver. The police asked appellant if they could see the gun, and he sent his wife to get it. She retrieved the gun from an upstairs room and handed it to Corporal Watson.

After being given the gun, the police informed appellant that they had a search warrant for his home and asked him if he would accompany them to the police station for additional questioning. Holmberg told appellant that he was not under arrest, that he was under no obligation to go to

the station and that, once at the station, appellant would be free to leave whenever he wished. According to Holmberg, appellant's response was that he would be glad to go down to the police station.

Upon arrival at the police station, appellant was taken to an interview room and left alone for a few minutes with the door open. He was then presented with a "notification of non-arrest" form which provided as follows:

I, Samuel Ray REED, do hereby acknowledge that I have accompanied Lt. HOLMBERG and Cpl. WATSON of the Pa. State Police to the station at Rockview at their request and by my own choice.

I understand I am not under arrest and am free to leave at any time.

No promises have been made to me and I have not been threatened or coerced in any way.

I understand that I may stop talking or refuse to answer any particular question I choose not to answer.

The form was explained to appellant, and he indicated that he understood the form and signed it. He was then questioned by police about his activities on the previous day. He said that he had met the victim at the residence of the victim's girlfriend, after which he and the victim had gone to a bar. The police questioned appellant regarding some inconsistent statements which he had made and revealed that they knew that the victim had been killed at 10:30 p.m. on the previous evening. They also disclosed that there had been a witness to the shooting. After this, appellant's demeanor visibly changed and he asked, very slowly, whether the police knew who did it. The police continued to question appellant regarding his inconsistent statements, when, according to Lieutenant Holmberg, appellant "looked down at the floor and he kind of muttered, maybe I should get a lawyer." In response, Holmberg motioned towards the door and again told appellant that he was free to go. Appellant sat silently for about a minute, and Holmberg then said to him "all we want is the truth." Appellant then blurted out, "Okay I did it ... you got the times down

pretty close." Appellant thereupon gave an oral confession to Holmberg and Watson in which he explained the details of the killing.

Following appellant's oral confession, Holmberg informed him that he would be arrested and charged with criminal homicide. He also gave appellant the option of going home that evening and turning himself in the next morning. Instead, appellant agreed to remain and make a formal statement. He was then informed of his *Miranda* rights by Trooper Frederick Caldwell, who, after appellant had waived his rights, took a formal statement.[2] Appellant

2. The formal statement given by appellant appears as follows:

Q. Do you understand your rights as I have explained them to you?
A. Yes, sir.
Q. With these rights in mind, do you now wish to make a statement?
A. Yeah.
Q. Can you read and write the English Language?
A. Yes.
Q. Were you with Randy P. REED between the hours of 9:00 pm and 10:30 pm on Thursday, 11 Feb 88?
A. Yes.
Q. Did you become involved in an argument with Randy P. REED while traveling in your personal vehicle?
A. Yes.
Q. Did you travel to the Pleasant Gap fire company grounds in Benner Twp., and exit the vehicle to urinate?
A. Yes.
Q. Did you then shoot Randy P. REED at that location at about 10:30 pm using your own Ruger revolver?
A. Yes.
Q. Did you then shoot at him several times?
A. Yes.
Q. Was the .357 magnum ammunition used in the revolver of the jacketed hollow point type?
A. I think I had both in it, .357 and .38. The .357 is jacketed.
Q. Is the gun you used to shoot Randy P. REED the same one siezed [sic] by the State Police in the search of your home?
A. Yes.
Q. Did you shoot Randy P. REED because you felt that he had abandoned your sister, his wife?
A. Yes.
Q. Is the information contained in this Three page statement true and correct to the best of your knowledge and belief?
A. Yes.
Q. Was this statement given of your own free will and accord, without any promises or threats?

thereafter agreed to submit to arrest, and he was transported for preliminary arraignment.

The suppression court determined that appellant had not been in custody before *Miranda* warnings were given. The oral statements which he made during this period, therefore, were not subject to suppression because of the absence of such warnings. *"Miranda* warnings are necessary only on those occasions when a suspect is undergoing actual 'custodial interrogation.'" *Commonwealth v. Fento,* 363 Pa.Super. 488, 492, 526 A.2d 784, 786 (1987). See: *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Commonwealth v. Holcomb,* 508 Pa. 425, 498 A.2d 833 (1985), *cert. denied,* 475 U.S. 1150, 106 S.Ct. 1804, 90 L.Ed.2d 349 (1986); *Commonwealth v. Smith,* 382 Pa.Super. 288, 555 A.2d 185 (1989).

The test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate *Miranda* warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation. *Commonwealth v. Meyer,* 488 Pa. 297, 412 A.2d 517 (1980); *Commonwealth v. Brown,* 473 Pa. 562, 375 A.2d 1260 (1977); *Commonwealth v. Fisher,* 466 Pa. 216, 352 A.2d 26 (1976); *Commonwealth v. O'Shea,* 456 Pa. 288, 318 A.2d 713, *cert. denied,* 419 U.S. 1092, 95 S.Ct. 686, 42 L.Ed.2d 685 (1974).

*Commonwealth v. Chacko,* 500 Pa. 571, 577, 459 A.2d 311, 314 (1983). See also: *Commonwealth v. Gonzalez,* 519 Pa. 116, 546 A.2d 26 (1988); *Commonwealth v. Marabel,* 445 Pa. 435, 283 A.2d 285 (1971); *Commonwealth v. Toanone,*

A.  Yes.
Q.  Do you understand what we are talking about in this statement?
A.  Yes.
Q.  Are there any corrections in the statement that you wish to make?
A.  No.

The statement was signed by appellant and initialed by him on each of its three pages.

381 Pa.Super. 336, 553 A.2d 998 (1989). The Superior Court, sitting en banc, has developed the following guidelines for determining when *Miranda* warnings are required:

First, the mere fact that the police investigation has focused on a particular person will not require *Miranda* warnings before police interviews with that person. See *Beckwith v. United States, supra; Commonwealth v. McLaughlin, supra.* Second, if the police in fact place a person in custody or restrict his freedom in any significant way prior to, or during, the interview, then the interrogators must advise that person of his *Miranda* rights. *Miranda v. Arizona, supra; Commonwealth v. Leaming,* 432 Pa. 326, 247 A.2d 590 (1968); *Commonwealth v. Moody,* 429 Pa. 39, 239 A.2d 409 (1968); *cert. denied,* 393 U.S. 882, 89 S.Ct. 189, 21 L.Ed.2d 157. Third, a suspect actually may be in custody even if the police have not taken him to a police station or formally arrested him. Fourth, and this proposition is not without some doubt, "custodial interrogation" occurs when a suspect "... is placed in a situation in which he reasonably believes that his freedom of action of movement is restricted by such interrogation." *Commonwealth v. Brown, supra,* 473 Pa. at 570, 375 A.2d at 1264; *Commonwealth v. Fisher, supra; Commonwealth v. O'Shea, supra; Commonwealth v. Romberger,* 454 Pa. 279, 312 A.2d 353 (1973); *Commonwealth v. Marabel,* 445 Pa. 435, 283 A.2d 285 (1971).

*Commonwealth v. Anderson,* 253 Pa.Super. 334, 345, 385 A.2d 365, 370–371 (1978) (footnote omitted). See: *Commonwealth v. Holcomb, supra* at 439–440, 498 A.2d at 840. See also: *Commonwealth v. Palm,* 315 Pa.Super. 377, 462 A.2d 243 (1983); *Commonwealth v. Nunez,* 312 Pa.Super. 584, 459 A.2d 376 (1983); *Commonwealth v. Schoellhammer,* 308 Pa.Super. 360, 454 A.2d 576 (1982).

A careful review of the testimony at appellant's suppression hearing discloses ample support for the court's finding that appellant was not in custody when he made inculpatory statements. The police had sought appellant's permission

before questioning him at his home and had told him he was not under arrest, that he did not have to answer any questions, and that the questioning would stop at any time appellant wished. Similar statements were made to appellant prior to questioning at the police station. Appellant voluntarily submitted himself to police questioning, both at his home and the police station. He fully understood, moreover, that he was free to stop the questioning and leave at any time. Under these circumstances, appellant was not subjected to custodial interrogation, and *Miranda* warnings were unnecessary. See: *Commonwealth v. Holcomb, supra* at 436–441, 498 A.2d at 838–841 (where defendant voluntarily went to police station for questioning, was not under arrest at that time and was free to leave station at any time; defendant was not in custody and *Miranda* warnings were not necessary). See also: *Oregon v. Mathiason, supra; Commonwealth v. Anderson, supra.*

For similar reasons, we reject appellant's contention that all statements made after he had expressed a desire to talk to counsel should have been suppressed. His reliance upon the holding of the United States Supreme Court in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981),[3] that all police questioning must cease when a defendant invokes his right to counsel under *Miranda*, is misplaced. A close reading of *Edwards* reveals that the Supreme Court was speaking of a defendant's invocation of his right to counsel during custodial interrogation. Thus, the Court in *Edwards* said:

In *Miranda v. Arizona*, the Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to

3. See also: *Commonwealth v. Zook,* 520 Pa. 210, 553 A.2d 920 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 203, 107 L.Ed.2d 156 (1989); *Commonwealth v. Gibbs,* 520 Pa. 151, 553 A.2d 409 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 403, 107 L.Ed.2d 369 (1989); *Commonwealth v. Hackney,* 353 Pa.Super. 552, 510 A.2d 800 (1986). Compare: *Commonwealth v. Hubble,* 509 Pa. 497, 504 A.2d 168 (1986), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986).

the presence of an attorney. 384 US, at 479, 16 L Ed 2d 694, 86 S Ct 1602 [1630], 10 Ohio Misc 9, 36 Ohio Ops 2d 237, 10 ALR3d 974. The Court also indicated the procedures to be followed subsequent to the warnings. If the accused indicates that he wishes to remain silent, "the interrogation must cease." If he requests counsel, "the interrogation must cease until an attorney is present." *Id.* at 474, 16 L Ed 2d 694, 86 S Ct 1602 [1627], 10 Ohio Misc 9, 36 Ohio Ops 2d 237, 10 ALR3d 974.

. . . .

*[W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.* We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards v. Arizona, supra* 451 U.S. at 481–482 and 484–485, 101 S.Ct. at 1883 and 1884–1885, 68 L.Ed.2d at 384 and 386 (emphasis added) (footnote omitted). See also: *Commonwealth v. Hubble,* 509 Pa. 497, 518, 504 A.2d 168, 179 (1986), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986) (Flaherty, J., Concurring) ("Custodial interrogation is also a predicate of the *Edwards* case").

Instantly, it is clear that appellant was not in custody at the time he made the remark about getting counsel. He had voluntarily agreed to accompany the police to the station for further questioning and he had been informed repeatedly that he did not have to answer questions and was free to leave at any time. Indeed, he had agreed in writing, without coercion, that he understood that he wasn't under arrest, was free to leave at any time, and could

refuse to answer questions. When appellant suggested the possible need for a lawyer, Lieutenant Holmberg told him again that he was free to go. Appellant, however, did not leave. Instead, he remained and confessed to the killing. Under these circumstances, appellant's statements were not subject to suppression merely because the questioning continued after he mentioned the possibility of getting a lawyer.[4]

Prior to the start of trial, appellant made a motion in limine by which he requested that the Commonwealth be precluded from introducing into evidence photographs and slides of the victim's body, as well as the clothing worn by the victim at the time he was shot. The disputed items of evidence were described in the trial court's opinion as follows:

The photographs and slides to which Defendant objects depict the victim's body as it was found at the scene of the crime and, later, when it was being prepared for autopsy. The photographs and slides are in color.

The pictures taken at the scene of the crime show the victim lying on the ground, partially covered with snow. He is clad in dark blue denim jeans, a navy blue T-shirt, and a navy blue windbreaker jacket. Although his clothing is soaked with blood, that fact is not easily discernible due to the already dark colors of the clothing. There is some blood in the snow around the body but, again, that fact is not immediately apparent, absent someone pointing it out. As for the pictures taken just prior to autopsy, these show the various entry and exit wounds of the bullets, apparently after the body had been cleaned up. Counsel for Defendant has pointed out the presence of some blood on the victim's leg in one of the photographs, but there is really no more than a trace of it.

4. Appellant's further suggestion that the formal statement given after *Miranda* warnings should have been suppressed as the fruit of prior illegally obtained statements is meritless in view of our determination that the earlier statements were not the product of custodial interrogation.

After a hearing on appellant's motion, the trial court ruled that the Commonwealth would be permitted to introduce the photos, slides and clothing into evidence. Appellant asserts that this ruling was erroneous.

The standard regarding the admissibility of photographs of homicide victims was summarized by the Supreme Court in *Commonwealth v. Garcia*, 505 Pa. 304, 479 A.2d 473 (1984) in the following manner:

> The admission into evidence of photographs depicting the corpse of the homicide victim or the location and scene of the crime lies within the sound discretion of the trial judge. *See Commonwealth v. Hudson*, 489 Pa. 620, 630, 414 A.2d 1381, 1386 (1980); *Commonwealth v. Gilman*, 485 Pa. 145, 152, 401 A.2d 335, 339 (1979); *Commonwealth v. Gidaro*, 363 Pa. 472, 474, 70 A.2d 359, 360 (1950). A photograph which is judged not inflammatory is admissible if "it is relevant and can assist the jury in understanding the facts." *Commonwealth v. Gilman*, 485 Pa. at 153, 401 A.2d at 339. A gruesome or potentially inflammatory photograph is admissible if it is of "such essential evidentiary value that [its] need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." *Commonwealth v. McCutchen*, 499 Pa. 597, 602, 454 A.2d 547, 549 (1982) (quoting *Commonwealth v. Petrakovich*, 459 Pa. 511, 521, 329 A.2d 844, 849 [1974]). The fact that blood is visible in a photograph does not necessarily require a finding that the photograph is inflammatory. *Commonwealth v. Hudson*, 489 Pa. at 631, 414 A.2d at 1387; *Commonwealth v. Sullivan*, 450 Pa. 273, 281, 299 A.2d 608, 612, *cert. denied*, 412 U.S. 923, 93 S.Ct. 2745, 37 L.Ed.2d 150 (1973).

*Id.* 505 Pa. at 313, 479 A.2d at 478. See also: *Commonwealth v. O'Shea*, 523 Pa. 384, 400–401, 567 A.2d 1023, 1030–1031 (1989); *Commonwealth v. Alarie*, 378 Pa.Super. 11, 14, 547 A.2d 1252, 1253 (1988). In making a determination of the admissibility of such photographs, a trial court must apply a two step analysis.

The trial judge must initially decide whether the photographs possess inflammatory characteristics. If they do not the photographs are admissible as are any evidentiary items, subject to the qualification of relevance. If the photographs are deemed inflammatory, then the trial judge must decide whether the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of their inflaming the passions of the jurors. *Commonwealth v. Hudson*, 489 Pa. 620, 630, 414 A.2d 1381, 1386 (1980).

*Commonwealth v. Strong*, 522 Pa. 445, 453, 563 A.2d 479, 483 (1989). See also: *Commonwealth v. Miller*, 490 Pa. 457, 468–469, 417 A.2d 128, 134 (1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981); *Commonwealth v. Batty*, 482 Pa. 173, 177, 393 A.2d 435, 437 (1978). These same basic principles are applicable to a determination of the admissibility of a victim's clothing. See: *Commonwealth v. Martinez*, 475 Pa. 331, 336, 380 A.2d 747, 750 (1977); *Commonwealth v. Frederick*, 327 Pa.Super. 199, 213, 475 A.2d 754, 761 (1984). See also: *Commonwealth v. Meadows*, 381 Pa.Super. 354, 366, 553 A.2d 1006, 1012 (1989) (presence of dried blood on item of victim's clothing admitted into evidence does not necessarily render such evidence inflammatory).

After viewing the challenged photographs, slides and clothing and hearing the arguments of counsel, the trial court determined that such items of evidence were not inflammatory and could be presented by the Commonwealth at trial. In a separate opinion, the court explained its ruling as follows:

Counsel for Defendant has cited us to *Commonwealth v. Scaramuzzino*, 455 Pa. 378, 317 A.2d 225 (1974), where the Pennsylvania Supreme Court reversed the first degree murder conviction of the defendant and granted him a new trial after deciding the trial court had abused its discretion in admitting color slides of the victim into evidence. However, the photographs admitted in *Scaramuzzino* included three photographs of the heart re-

moved from the body, and five which "portrayed the wounded portions of the nude torso emphasizing, because of the color, the dried blood, including a side view of the torso with glass rods protruding from the wounds to indicate the direction of the wounds." *Scaramuzzino,* 455 Pa. at 380–81, 317 A.2d at 226. The photographs and slides at issue in the instant case are not shocking or graphic when compared to those in *Scaramuzzino.* Rather, they showed cleaned bullet wounds and, although one of these wounds was to the victim's face, are not inflammatory. To be inflammatory "the depiction must be of such a gruesome nature or be cast in such an unfair light that it would tend to cloud an objective assessment of the guilt or innocence of the defendant." *Commonwealth v. Hubbard,* 472 Pa. 259, 281, 372 A.2d 687, 697 (1977). These photographs are neither gruesome nor exploitative and the jury should not be shielded from viewing them.

. . . .

For these very same reasons, and based upon the description of the clothing given earlier in our discussion, we find the victim's bloodstained clothing in the instant case to be likewise admissible.

We have also studied the challenged exhibits. After doing so, we are unable to conclude that the trial court abused its discretion by allowing the same to be received in evidence. Although the photos, slides and items of clothing are not pleasant to view, we find therein no basis for concluding that the matters depicted were so gruesome as to have precluded the jury from returning a fair and true verdict. Indeed, the jury's acquittal of appellant on the charge of first degree murder would seem to militate against an attempt to second-guess the trial court and hold the disputed evidence so inflammatory that it was likely to have caused a verdict based upon passion or prejudice. The photos and slides of the victim's body which depicted the location of the wounds were relevant to support the infer-

ence of a specific intent to kill. They were also relevant as an aid to the pathologist in explaining his findings to the jury, as were the items of clothing worn by the victim. We conclude, therefore, that this Court should not disturb the trial court's ruling.

At trial, appellant called Dr. Robert Sadoff, a psychiatric expert, who testified that, in his opinion, appellant had been suffering from alcohol induced amnesia regarding the events of the shooting; and, therefore, his confession to the police could not have been based upon an accurate recollection of the incident. Dr. Sadoff was not permitted to relate to the jury, however, that appellant had, while under hypnosis, given a version of the shooting which differed substantially from that given to police. The trial court also ruled that a videotape of appellant's hypnotic interview could not be shown to the jury. Appellant contends that the court's ruling was erroneous because the evidence of his statements under hypnosis was not offered for the truth of the matters asserted therein but only to establish that such statements had been made. The trial court rejected this argument, concluding that the proffered evidence was scientifically unreliable and, therefore, inadmissible.

In *Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981), the Pennsylvania Supreme Court first addressed the issue of the admissibility of hypnotically influenced testimony during a criminal trial. The Court held that the witness's hypnotically refreshed testimony had been properly excluded where the witness had no recollection of the facts to be testified to prior to hypnosis. In reaching this conclusion, the *Nazarovitch* court observed the great amount of skepticism with which the scientific community viewed hypnotism. It determined, therefore, that the introduction of hypnotically refreshed testimony would not be permitted until such time as the Court was "presented with more conclusive proof than has been offered to date of the reliability of hypnotically-retrieved memory." *Commonwealth v. Nazarovitch, supra*, 496 Pa. at 111, 436 A.2d at 178. The Supreme Court again refused to sanction the

admissibility of hypnotically influenced testimony in *Commonwealth v. Smoyer*, 505 Pa. 83, 476 A.2d 1304 (1984). See also: *Commonwealth v. DiNicola*, 348 Pa.Super. 405, 502 A.2d 606 (1985), *cert. denied*, 484 U.S. 1028, 108 S.Ct. 755, 98 L.Ed.2d 768 (1988); *Commonwealth v. McCabe*, 303 Pa.Super. 245, 449 A.2d 670 (1982). Compare: *Commonwealth v. Romanelli*, 336 Pa.Super. 261, 485 A.2d 795 (1984), *affirmed*, 522 Pa. 222, 560 A.2d 1384 (1989) (witness may testify to events remembered prior to hypnosis); *Commonwealth v. Taylor*, 294 Pa.Super. 171, 439 A.2d 805 (1982) (same).

In the instant case, we conclude that the trial court properly rejected appellant's attempts to introduce the version of the shooting elicited from him while under hypnosis. In so doing, we adopt the reasoning of the trial court as follows:

> The Supreme Court [in *Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981)], characterized this issue as a "scientific evidence" problem. The leading case in establishing the standard by which admissibility of scientific evidence must be judged is *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). In *Frye*, the Court explained:
>
>> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define.... (W)hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.
>
> *Frye*, 293 F. at 1014.
>
> The Supreme Court in *Nazarovitch* noted that the rationale behind the *Frye* standard of admissibility stems from "fear that the trier of fact will accord uncritical and absolute reliability to a scientific device without consideration of its flaws in ascertaining veracity." *Nazarovitch*, 496 Pa. at 102, 436 A.2d at 173 (citation omitted). While the Court conceded the usefulness of hypnosis as "a

powerful medical technique," *Id.* (citation omitted), it expressed serious reservations about the *forensic* use of hypnosis to establish *facts.*

We acknowledge Defendant's argument that he only sought to use the statements he made under hypnosis for the purpose of casting doubt upon his confession to the police, rather than for the truth of those statements. According to psychiatrist Dr. Robert L. Sadoff, at the time of his confession Defendant was suffering from amnesia as to the events of the night the crime occurred. By admitting evidence related to Defendant's hypnotic session, the Court would in effect be permitting Defendant to show the jury that his confession is not credible. The flaw with Defendant's argument lies in the fact this Court did not exclude evidence of the hypnosis on the basis of hearsay; rather, the Court excluded it as improper "scientific evidence."

In *Nazarovitch,* the Court noted that two important characteristics of a subject in a hypnotic trance are hyper-suggestibility and hypercompliance. 496 Pa. at 104, 436 A.2d at 174 (citation omitted). The Court cited scientific articles which explained that the hypnotized subject is easily influenced and highly motivated to please others. *Id.* Moreover, in instances of forensic hypnosis, the subject tends to be aware that he is there precisely because he is unable to remember facts. Thus, his desire to please others often leads him to unconsciously "confabulate"—that is, to fill in the gaps left by his loss of memory with fantasy. *Id.* (citing E. Monaghan, *Hypnosis in Criminal Investigation* 86 (1980))

With this information in mind, ... it was imperative to exclude all mention of the hypnotic session. Defendant first sought to introduce a videotape of the session as evidence, and the Court refused. Alternatively, Defendant asked the Court to at least permit him to introduce the evidence that, while under hypnosis, he gave a different version of what occurred the night Randy Reed died. We could not justify allowing that into evidence, since

neither the Court nor the scientific community can be assured that the "different version" itself was not a product of confabulation. That is, if Defendant was still unable to recall the events of the night in question, while under hypnosis, he may very well have unconsciously created the story he told while under hypnosis. If that were true, then not even the fact that he told a "different story" while under hypnosis could properly be admitted into evidence. Because many "members of the scientific community hold the view that criteria have not yet been developed whereby the accuracy of hypnotically-adduced testimony can reasonably be assured," 496 Pa. at 105, 436 A.2d at 174–5, it is not "generally accepted in the scientific community" under *Frye* and has no place in a court of law.

Cf. *Commonwealth v. Stark*, 363 Pa.Super. 356, 369–371, 526 A.2d 383, 390–391 (1987) (psychiatrist was properly precluded from testifying regarding results of truth serum test administered to defendant or to any statements made by defendant while test was in progress, as truth serum tests were lacking in scientific reliability).

The trial court's ruling is consistent with decisions in other jurisdictions. A similar issue was presented to the Supreme Court of Virginia in *Greenfield v. Commonwealth*, 214 Va. 710, 204 S.E.2d 414, 92 A.L.R.3d 432 (1974). There, a psychiatrist testifying for the defense in a murder trial was permitted to testify that, in his opinion, the defendant had been unconscious at the time of the killing. The witness was not permitted, however, to testify regarding that which he had learned from the defendant while the defendant was under hypnosis. In upholding the trial court's exclusion of such testimony, the Virginia Supreme Court reasoned as follows:

Most experts agree that hypnotic evidence is unreliable because a person under hypnosis can manufacture or invent false statements. See 3A Wigmore, Evidence, § 998 at 943, Chadbourn (rev. 1970); "Hypnosis as a Defense Tactic," 1 Toledo L.Rev. 691, 700 (1969); Note:

"Hypnotism and the Law," 14 Vand.L.Rev. 1509, 1518 (1961); Herman, "The Use of Hypno-Induced Statements in Criminal Cases," 25 Ohio St.L.J. 1, 27 (1964). A person under a hypnotic trance is also subject to heightened suggestibility. McCormick, Law of Evidence, § 208 at 510 (2d ed. 1972). There it is said:

"Declarations made under hypnosis have been treated judicially in a manner similar to drug-induced statements. The hypnotized person is ultrasuggestible, and this manifestly endangers the reliability of his statements. The courts have recognized to some extent the usefulness of hypnosis, as an investigative technique and in diagnosis and therapy. However, they have rejected confessions induced thereby, statements made under hypnosis when offered by the subject in his own behalf, and opinion as to mental state based on hypnotic examination." (Footnotes omitted.)

*Greenfield v. Commonwealth, supra* at 715–716, 204 S.E.2d at 419, 92 A.L.R.3d at 439. The appellate decisions in other states have also excluded recordings of pre-trial hypnotic interviews and testimony describing pre-trial statements made under hypnosis. See: *People v. Hiser,* 267 Cal.App.2d 47, 72 Cal.Rptr. 906, 41 A.L.R.3d 1353 (1968); *People v. Diaz,* 644 P.2d 71 (Colo.App.1981); *Rodriguez v. State,* 327 So.2d 903 (Fla.App.1976); *Emmett v. State,* 232 Ga. 110, 205 S.E.2d 231 (1974); *State v. Mack,* 292 N.W.2d 764 (Minn.1980); *State v. Pusch,* 77 N.D. 860, 46 N.W.2d 508 (1950); *Jones v. State,* 542 P.2d 1316 (Okla.Crim.App. 1975); *State v. Harris,* 241 Or. 224, 405 P.2d 492 (1965). See also: Annot., Admissibility Of Hypnotic Evidence At Criminal Trial, 92 A.L.R. 442 (1979).

For all these reasons, we perceive no error in the trial court's exclusion of the videotape of appellant's hypnotic interview and of the psychiatrist's testimony regarding appellant's statements while under hypnosis.

During closing argument by the prosecuting attorney, three defense objections to comments by the prosecu-

tor were sustained. These objectionable remarks and the court's responses were as follows:

What happened between the first shot and then the flurry at the end? You might conclude that Randy took off running and Sam went after him. Dr. Handte told you how even with a devastating potentially mortal wound which Randy had with the shot to the chest, we know from combat histories that people can get shot, a soldier can get shot and suffer a terrible wound and he keeps on going.

MS. LUX: Objection, Your Honor. This wasn't established at trial.

THE COURT: Yes. I agree. With regard to that, the conjecture is a little bit too far. That is not what Dr. Handte testified specifically with regard to soldiers. So you must contain your statements a little closer to the evidence and the reasonable inferences; not what you think might occur under the circumstances.

Later, the prosecuting attorney argued:

What do we know about Randy? He was a trucker, and he was doing pretty well. And Randy was maybe what Sam wasn't. And that hat relates to this role as a trucker. Because we know from the evidence that it was covered with little emblems and pins which showed the different states he had been in and so forth. That is like an emblem or a badge of honor. He was a trucker. He was proud of it. It was part of Randy. It was something that Sam wasn't. And when Sam killed him, and he took the hat.

It's like a hunter who wants the rack off of a buck that he has shot or the Indians that used to scalp their—

MS. LUX: Objection, Your Honor.

THE COURT: Sustained. Mr. Gricar, there is no reason to start talking about what indians did and about scalping. Now please, keep your remarks to the evidence

in this case and the logical inferences as you see that they could draw.

Finally, the following argument was made:

That's what he thought he was in this case. Some kind of a crusader. You know, Mr. Gallant on behalf of his sister. Brooding about it. Did it. Killed him. Kind of like your knight in shining beer cans.

MS. LUX: Objection, Your Honor.

THE COURT: Sustained.

At the conclusion of the prosecutor's closing argument, defense counsel moved for a mistrial, arguing that "the cumulative effect of referring to indians scalping, referring to the knight in shining beer cans, et cetera, et cetera—references to hunting—has precluded my client the right to a fair trial...." The trial court denied the motion for mistrial, and appellant argues that its ruling was erroneous.

The decision to grant or deny a motion for mistrial is within the sound discretion of the trial court. A mistrial is necessary only when the incident upon which the motion is based was of such a nature as to deny the defendant a fair trial. *Commonwealth v. Crawley,* 514 Pa. 539, 554, 526 A.2d 334, 342 (1987). See also: *Commonwealth v. Chestnut,* 511 Pa. 169, 176, 512 A.2d 603, 606 (1986); *Commonwealth v. Hernandez,* 498 Pa. 405, 415, 446 A.2d 1268, 1273 (1982). "[W]hen prompt curative or cautionary instructions are given by the court, an abuse of discretion will not readily be found." *Commonwealth v. Meadows, supra* 381 Pa.Super. at 360, 553 A.2d at 1009. See also: *Commonwealth v. Lawson,* 519 Pa. 175, 546 A.2d 589 (1988); *Commonwealth v. Thomas,* 361 Pa.Super. 1, 15, 521 A.2d 442, 449 (1987).

In reviewing claims of prosecutorial misconduct, the Supreme Court has established the following guidelines:

It is well established that a prosecutor, just as a defense attorney, must have reasonable latitude in presenting a case to the jury and must be free to present his or her arguments with "logical force and vigor."

*Commonwealth v. Smith,* 490 Pa. 380, 387, 416 A.2d 986 (1980), *quoting Commonwealth v. Cronin,* 464 Pa. 138, 143, 346 A.2d 59, 62 (1975). Counsels' remarks to the jury may contain fair deductions and legitimate inferences from the evidence presented during the testimony. *Commonwealth v. Fairbanks,* 453 Pa. 90, 306 A.2d 866 (1973); *Commonwealth v. Stevens,* 276 Pa.Super. 428, 419 A.2d 533 (1980). The prosecutor may always argue to the jury that the evidence establishes the defendant's guilt, *Commonwealth v. Capalla,* 322 Pa. 200, 185 A. 203 (1936) although a prosecutor may not offer his personal opinion as to the guilt of the accused either in argument or in testimony from the witness stand. *Commonwealth v. DiNicola,* 503 Pa. 90, 468 A.2d 1078 (1983); *Commonwealth v. Pfaff,* 477 Pa. 461, 384 A.2d 1179 (1978); *Commonwealth v. Cronin, supra.* Nor may he or she express a personal belief and opinion as to the truth or falsity of evidence of defendant's guilt, including the credibility of a witness. *Commonwealth v. Kuebler,* 484 Pa. 358, 399 A.2d 116 (1979) (where defendant's version of events was branded a "big lie"); ABA Standards for Criminal Justice, Standards Relating to the Prosecution Function Section 5.8(b) (Approved Draft, 1971).

However not every intemperate or uncalled for remark by the prosecutor requires a new trial. As we have stated many times:

> [C]omments by a prosecutor do not constitute reversible error unless the "unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Anderson, supra* at 501 Pa. [275, at] 282, 461 A.2d [208, at] 211 [1983]; *Commonwealth v. Upsher,* 497 Pa. 621, 627, 444 A.2d 90, 93 (1982).

*Commonwealth v. Carpenter,* 511 Pa. 429, 439, 515 A.2d 531 (1986); *Commonwealth v. D'Ambro,* 500 Pa. 303, 309–10, 456 A.2d 140 (1983). Furthermore, the prejudicial

effect of the prosecutor's remarks must be evaluated in the context in which they occurred. *Commonwealth v. Carpenter, supra,* 511 Pa. at 439, 515 A.2d 531, *quoting Commonwealth v. Smith, supra,* 490 Pa. at 388, 416 A.2d at 989.

*Commonwealth v. D'Amato,* 514 Pa. 471, 489–490, 526 A.2d 300, 309 (1987). See also: *Commonwealth v. Yabor,* 376 Pa.Super. 356, 370–371, 546 A.2d 67, 74 (1988); *Commonwealth v. Toledo,* 365 Pa.Super. 224, 235–236, 529 A.2d 480, 486 (1987).

In this case, the comments of the prosecutor to which the defense objected, although improper, did not rise to such a level as to render the jury unable to evaluate the evidence fairly and return an unbiased verdict. On two occasions, after sustaining defense objections, the trial court warned the prosecutor to conform his argument to the facts in evidence and reasonable inferences therefrom. On at least one of these occasions, the prosecutor's argument was not completed. None of the statements made by the prosecuting attorney were of a nature calculated to vilify or unfairly impede the jury from coolly reflecting upon the evidence and rendering an impartial verdict. In all instances, the trial court promptly and emphatically sustained defense objections. The court did not abuse its discretion when it refused also to grant a motion for mistrial.

Appellant also argues that the trial court erred when it refused to instruct the jury that involuntary manslaughter was a possible verdict. With respect to the necessity for a jury charge on involuntary manslaughter, the Supreme Court has held that "in a murder prosecution, an involuntary manslaughter charge shall be given only when requested, and where the offense has been made an issue in the case and the trial evidence reasonably would support such a verdict." *Commonwealth v. White,* 490 Pa. 179, 185, 415 A.2d 399, 402 (1980) and *Commonwealth v. Williams,* 490 Pa. 187, 190, 415 A.2d 403, 404 (1980). See also: *Commonwealth v. Smith,* 511 Pa. 343, 356, 513 A.2d 1371, 1377–1378 (1986), *cert. denied,* 480 U.S. 951, 480 U.S.

951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987). Appellant argues that evidence that he was drinking alcohol on the night of the killing could have led the jury to conclude that he had acted negligently or recklessly in causing the victim's death. Thus, appellant suggests that his "[s]hooting a .357 Magnum revolver in a dark field while under the influence of alcohol could certainly be found to be reckless or grossly negligent." [5]

The principal evidence at trial establishing how and why the killing had occurred came from statements made by appellant to the police. In these statements, appellant said that he had been angry at the victim (his brother-in-law) because of the way he had abandoned his wife (appellant's sister). On the evening of the killing, appellant had taken the victim to an isolated field and shot him five times with a .357 revolver. The last of the five shots was into the victim's face at point blank range. There was no evidence from which a jury could have found that the killing had been unintentional because appellant had recklessly fired a gun into a dark field.

The fact that appellant had been drinking on the night of the killing would not have been a basis for reducing an intentional killing to involuntary manslaughter. Evidence of voluntary intoxication may reduce murder of the first degree to murder of the third degree, but it cannot reduce murder of the third degree to manslaughter. See: *Commonwealth v. Ruff*, 266 Pa.Super. 497, 405 A.2d 929 (1979). See also: *Commonwealth v. Milburn*, 488 Pa. 601, 413 A.2d 388 (1980); *Commonwealth v. Fairell*, 476 Pa. 128, 381 A.2d 1258 (1977).

'Where the question of intoxication is introduced into a murder case its only effect could be to negate the specific

---

5. The crime of involuntary manslaughter is defined by statute as follows:

   (a) **General rule.**—A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person.

18 Pa.C.S. § 2504(a).

intent to kill which is required for a finding of murder of the first degree.... If intoxication does render an accused incapable of forming the necessary intent the result is to reduce the crime to a lesser degree of murder. In no event does the reduction change the character of the crime from murder to manslaughter.'

*Commonwealth v. Breakiron*, 524 Pa. 282, 295–96, 571 A.2d 1035, 1041 (1990), quoting *Commonwealth v. England*, 474 Pa. 1, 19–20, 375 A.2d 1292, 1301 (1977). Therefore, appellant was not entitled to have the jury instructed on the law of involuntary manslaughter. The trial court did not err when it refused a request therefor.

█ Appellant's final contention is that the trial court abused its discretion by imposing an excessive sentence. In a separate statement complying with Pa.R.A.P. 2119(f), appellant specifically asserts that the sentencing court failed to provide sufficient reasons in support of the sentence; failed to consider the nature and circumstances of the crime and the history and character of appellant; and abused its discretion by allowing the victim's mother and sister to sit at counsel table with the assistant district attorney during sentencing and allowing the sister to make an angry, emotional statement prior to the imposition of sentence. Because we deem these contentions substantial, we will review the discretionary aspects of sentencing.

█ "Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent an abuse of that discretion." *Commonwealth v. Anderson*, 381 Pa.Super. 1, 16, 552 A.2d 1064, 1072 (1988). However, the sentencing court must state its reasons for the sentence on the record, which in turn aids in determining "whether the sentence imposed was based upon accurate, sufficient and proper information." *Commonwealth v. Riggins*, 474 Pa. 115, 131, 377 A.2d 140, 148 (1977) (footnote omitted). When imposing sentence, a court is required to consider "the particular circumstances of the offense and the character of the defendant." *Commonwealth v. Frazier*, 347 Pa.Super. 64,

67, 500 A.2d 158, 159 (1985). Furthermore, the court must consider "the statutory factors enunciated for determination of sentencing alternatives," *Commonwealth v. Hainsey*, 379 Pa.Super. 376, 382, 550 A.2d 207, 209 (1988), and must impose a sentence which is "consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and the community, and the rehabilitative needs of the defendant." *Commonwealth v. Frazier, supra*. Where the sentencing judge had the benefit of a pre-sentence report, however, it will be presumed that he "was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Devers*, 519 Pa. 88, 101–102, 546 A.2d 12, 18 (1988). "Having been fully informed by the presentence report, the sentencing court's discretion should not be disturbed." *Id.*, 519 Pa. at 102, 546 A.2d at 18.

The Supreme Court has made it abundantly clear that the sentencing court's discretion is broad, and that a reviewing court should not disturb the exercise of that discretion except for substantial reasons. See, e.g.: *Commonwealth v. Ward*, 524 Pa. 48, 568 A.2d 1242 (1990); *Commonwealth v. Jones*, 523 Pa. 138, 565 A.2d 732 (1989); *Commonwealth v. Devers, supra*. Such reasons do not appear in the instant case. Here the sentencing court had available to it and fully considered a pre-sentence report and reviewed on the record each of the sentencing alternatives authorized by the Sentencing Code. The comments of the court during the sentencing hearing evidenced a careful consideration of appellant's character and personal circumstances as well as the nature of his crime. Our review of the record discloses no evidence of undue influence upon the sentencing court because of the presence of the victim's mother and sister at counsel table or from the sister's statement to the court. In short, our review of the record discloses no abuse of discretion.

Having found the issues raised by appellant to be lacking in merit, we affirm the judgment of sentence.

The judgment of sentence is affirmed.

TAMILIA, J., concurs in the result.

POPOVICH, J., files a dissenting opinion.

POPOVICH, Judge, dissenting.

I must respectfully dissent from the majority's conclusion that appellant was not subjected to custodial interrogation and, therefore, *Miranda* warnings were unnecessary. Basically, I disagree with the result reached by the majority after application of *Commonwealth v. Anderson*, 253 Pa. Super. 334, 385 A.2d 365 (1975) (setting forth guidelines for determining whether an interrogation was custodial in nature).

Consider the facts: The police arrived after 9:00 p.m. to question appellant about the murder of his brother-in-law. Appellant was the sole suspect in the case. Lt. Holmberg testified that he explained to appellant that he was not under arrest, appellant did not have to answer any questions and he could ask the officers to leave at any time. However, standing outside appellant's front door were two officers awaiting their opportunity to execute a search warrant for appellant's home and vehicles.

Rather than complete their "non-custodial" question-and-answer session at appellant's home, the officers, after asking for and receiving appellant's .357 caliber handgun, requested appellant to accompany them to the police station. Prior to leaving appellant's home, Corporal Watson, in the presence of appellant, informed the officers who were going to perform the search, "this is the revolver we're looking for."[1]

Appellant went with the police. He left on an extremely cold winter night in nothing but pants and a T-shirt. Before entering the police car, he was frisked, and, once

---

1. Appellant's wife testified that the officers informed appellant that if he did not come with them they would secure an arrest warrant. In response, the police denied making such a statement. However, we should remember that at the time this statement was alleged to have been made, the police investigation had focused on appellant, and the police possessed appellant's revolver which, by their own admission, they believed to be the murder weapon.

inside, he was accompanied in the back seat by a police officer. Appellant was not permitted to drive his own vehicle to the police barracks because, according to the police, it had to remain at appellant's home to be searched. Consequently, if appellant had wanted to leave the police station, he would have been forced to rely upon the police for transportation home.

Upon arrival at the police barracks, appellant signed the "Notification of Non-arrest." [2] The officers testified that throughout their conversation with appellant, the interrogation room door was open and that they repeatedly informed him that he was not under arrest.[3] Astoundingly, even after appellant admitted to the murder, the police told appellant he could to go home and return in the morning to turn himself in to the authorities! However, officers were positioned outside the barracks to prevent any attempt at escape.

To me, this case was clearly one of custodial interrogation. Despite the officers' self-serving testimony concerning their repeated assurances of "non-arrest", I am convinced that appellant reasonably believed he was subjected to a custodial interrogation. Appellant was the sole suspect; appellant knew the police believed his gun was the murder weapon; he knew the police had a search warrant for his house; appellant was not permitted to drive himself to the police station; appellant was frisked before entering the police cruiser; after arriving at the police station, he had no way to leave other than by police transport; although the door to the interrogation room was open, appellant was nonetheless inside the police barracks. On those

2. The "Notification of Non-arrest", typed on a blank piece of stationary, informed appellant he was not under arrest, was free to leave at any time, was not being threatened and could stop answering questions at any time.

3. From the officers' testimony regarding the number of times they informed appellant that he was free to go, one must wonder how, in the midst of insuring appellant knew he was not in custody, the officers found time to ask appellant any questions concerning the murder.

facts, I have no doubt that appellant believed he was not free to leave.

It is ironic that the actions by the police which are most demonstrative of the custodial nature of this interrogation are those by which the officers attempted to minimize the custodial appearance of the interrogation. Never in my seventeen years as a jurist have I heard of a "Notification of Non-arrest," and *neither have I ever heard of police offering to release an admitted murderer from custody so that he could go home for the evening and turn himself in for prosecution later.* I believe such actions reveal that the officers knew that the interrogation was custodial, and that, upon being surprised by appellants' sudden confession, they undertook to clothe an otherwise custodial interrogation into a cloak of false volition.

I, for one, am convinced appellant's constitutional rights were violated, *Miranda* warnings should have been issued, appellant's pre and post-arrest statements to the police should have been suppressed, and a new trial is warranted.